IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
Case No. 2:2010cv12626
Hon. John Corbett O'Meara

ABB INC.,

                        Plaintiff,

            v.

ROBOTIC VISIONTECH, LLC,
BRAINTECH, INC., and BRAINTECH
CANADA, INC.

                        Defendants.

**DECLARATION OF JAMES P. CONNELLY**

My name is James P. Connelly.  I am over eighteen (18) years of age and competent to testify as to the facts set forth below.  I have personal knowledge of the statements herein unless otherwise specified.

1.  I am presently employed by ABB Inc. ("ABB").  I have been employed by ABB since January 2007.  My title is Senior Attorney.  My job responsibilities include negotiating contracts and providing legal advice to a variety of business units.

2.  I am generally aware that ABB is a Delaware corporation with its principal office in Raleigh, North Carolina.

3.  ABB, among other things, manufactures, services and repairs electrical automation equipment, including robots and other control devices.  ABB is a leading supplier of industrial robots, modular manufacturing systems and service.  ABB has installed more than 175,000 robots worldwide.

4.   I am submitting this Declaration in support of ABB's Motion for Temporary Restraining Order and Preliminary Injunction.

**Defendants**

5.   I have been involved in the ABB-Braintech relationship for some time.

6.   I am aware that ABB originally dealt with Defendant Braintech Canada, Inc. ("Braintech Canada") which is or was a Canadian corporation that has or had its principal office in North Vancouver, British Columbia, Canada.

7.   Sometime after the initiation of our relationship with Braintech Canada, Braintech moved its operations to Virginia and began operating as Braintech Inc. ("Braintech"). However, both companies always essentially acted as "one" and I never saw any real distinction between the two.  It is my belief that, at this point, after numerous attempts to contact them, that Braintech is essentially defunct.

8.   I am generally aware the Robotic Vision Tech, LLC ("RVT") was formed by F.W. "Rick" Weindinger ("Weindinger") after Weindinger and others purchased the assets of Braintech at a private foreclosure sale.  Weindinger is, upon information and belief, a former officer and/or owner of Braintech.

9.   In general, in all my dealings with Braintech Canada and Braintech, they have essentially operated as a single entity, controlled by the same people.  For example, Braintech Canada's website (*see* http://www.braintech.com) lists the McLean, Virginia address as the headquarters address for "Braintech" and, upon information and belief, it appears Braintech Canada may have been acquired by or otherwise merged into Braintech.  Similarly, RVT's website formerly discussed its long history as "Braintech."

**Parties' Relationship History**

10. Over the past many years, ABB has invested large sums of money in Braintech, and Braintech Canada for the purpose of developing robotic vision systems.

11. Using ABB's investment, Braintech and Braintech Canada worked with ABB to develop vision software for robotic applications to enable ABB to compete against other existing vision technologies.

12. Based on my review of various filings made with the SEC, and based on my personal knowledge, ABB has served as, essentially, Braintech's and Braintech Canada's sole customer for many years.

**Contracts**

13. I am aware that on or about May 5, 2006, Defendant Braintech Canada entered into an "Exclusive Global Channel Partner Equipment" with ABB (the "Agreement"). Via the terms of the Agreement, ABB agreed to license at great expense certain of Braintech's vision guided robotics technologies and to fund development of additional technologies. A copy of the Agreement is attached as **Exhibit A.**

14. Upon information and belief, and based on Braintech's filings with the Securities and Exchange Commission, ABB payments for these licenses constituted all or nearly all of Braintech's revenue over the last several years. All told, ABB spent approximately $8,000,000 under the Agreement for approximately 600 software licenses.

15. In return for its significant commercial commitment to Braintech, the Agreement specifically gave ABB the right to have access to the software code and executables for the software ABB licensed under the Agreement. *See* **Exhibit A.**

16. Per paragraphs 27.1 through 27.3 of the Agreement, ABB's right to access the code and executables extended even beyond the term of the Agreement and/or any Braintech insolvency.  *See* **Exhibit A,** p.18.

17. Specifically, at ¶ 27.1 the parties agreed that ABB would have a right to "use the BRAINTECH software in executable and where necessary code form" for purposes of supporting systems ABB had installed with its customers. *See* **Exhibit A,** p. 18.

18. The parties effectuated this provision via, essentially, an escrow arrangement, with the code and executables first being held pursuant to ¶ 27.3, at the Law Offices of Clark Wilson in Vancouver, British Columbia, Canada. *See* **Exhibit A,** p.18.

19. Sometime during the course of the Agreement, as stated by Thomas McCabe (the Executive Vice President, General Counsel and Secretary of Braintech) in a letter to James D. VandeWyngearde, Esq. of Pepper Hamilton LLP in Detroit, Michigan dated April 27, 2009, Braintech moved to Virginia.  A copy of the April 27, 2009 letter is attached as **Exhibit B.**

20. After the move, Braintech deposited the escrowed software code and executables with Greenberg Traurig, LLP in McLean, Virginia. *See* **Exhibit B.**

21. The terms of this letter make it clear that Braintech and Braintech Canada were essentially acting as a single entity, and that it was Braintech who was setting up the escrow in Michigan for the benefit of ABB. *See* **Exhibit B.**

22. On February 24, 2009, Braintech and ABB entered into a Letter of Commercial Clarifications (the "Letter Agreement") designed to (a) reaffirm the existence and continued validity of the Agreement and (b) settle certain disputes that had arisen as to

the meaning of some of the terms in the Agreement, and clarify the ongoing contractual obligations of the parties.  A copy of the Letter Agreement is attached as **Exhibit C.**

23. In paragraph 5 of the Letter Agreement, Braintech reaffirmed the escrow arrangement in the Agreement, and agreed to additional terms allowing ABB the right to perform certain inspections related to the software code and executables. *See* **Exhibit C,** p.3.

24. The escrow then moved one additional time on April 27, 2009.  On that date, as referenced above, Braintech's General Counsel Thomas McCabe wrote to Jay VandeWyngearde of Pepper Hamilton LLP, referencing Section 27 of the original Agreement, and stating that "in deference to ABB's Detroit area location, Braintech sends you the Escrow in its most current updated form." *See* **Exhibit B.**

25. It is my understanding that the code and executables remain in escrow with Pepper Hamilton LLP at this point in time.

26. Shortly thereafter, on July 1, 2009, ABB and Braintech entered into another agreement entitled the "Equipment Loan Agreement" (the "Equipment Loan") by which ABB loaned an IRB 6600 IRC5 Robot and controller with the serial number 66-52030 and an IRB140 S4C+ Robot and controller with the serial number 14-11506 to Braintech (the "Robots").  A copy of the Equipment Loan is attached as **Exhibit D.**

27. Pursuant to Section 1 of the Equipment Loan, Braintech was to use the two Robots to improve its eVF software platform, and for that purpose only. *See* **Exhibit D.** This was an obligation undertaken by Braintech and funded by ABB under the original Agreement and ratified by the Letter Agreement.

28. The Robots, pursuant to Section 4 of the Equipment Loan, were not to be moved from Braintech's Pontiac, Michigan location without ABB's consent. *See* **Exhibit D.**

29. Pursuant to Section 5 of the Equipment Loan, ABB retained all title and ownership in the Robots. *See* **Exhibit D.**

### Defendants' Misconduct: Withholding of Code and Executables

30. As set forth in the Agreement and the Letter Agreement, Braintech and/or Braintech Canada was to place the software code and executables in escrow for use by ABB in servicing ABB's customers should Braintech and/or Braintech Canada become insolvent. *See* **Exhibits A and C.**

31. Upon information and belief, Braintech and/or Braintech Canada are now insolvent, and their assets – including, ostensibly, technical title to and ownership of the code and executables – have been, also upon information and belief, purchased by Weindinger and/or other former officers of Braintech and/or Braintech Canada.

32. On or about late April or early May 2010, upon information and belief, and based upon review of documents RVT filed with the States of Nevada and Virginia, Weindinger set up RVT in Nevada to own and operate the assets of Braintech and/or Braintech Canada.

33. Upon information and belief, Braintech's senior management purchased the security interest held by Braintech's lender(s) and then conducted a private auction sale in Virginia on or about May 24, 2010 at the Law Offices of Pillsbury Winthrop Shaw Pittman LLP, 1650 Tysons Boulevard, 14th Floor, McLean, VA 22102, by which they and/or RVT acquired Braintech's (and Braintech Canada's) assets.

34. That auction was advertised online at http://www.onlineauctionusa.com/auction_detail.php?id=137934. A print-out of that webpage is attached as **Exhibit E.**

35. Upon information and belief, certain Braintech and/or RVT personnel attempted to improperly obtain release of the code and executables from Pepper Hamilton LLP without ABB's consent via the private auction sale, which was designed to strip the assets of Braintech and/or Braintech Canada of any attached liabilities.

36. Meanwhile, ABB is unable to service its customers because of loss of access to the software and executables in derogation of its contractual rights, and is suffering ongoing disruption of business operations, loss of business opportunities, loss of goodwill and other commercial and reputational damage. Continuation of this situation will lead to irreparable harm to ABB.

37. In short, the software code and executables were, in essence, paid for via ABB's extensive investment in Braintech. ABB attempted to protect its right to access that code and those executables via the escrow arrangements set forth in the various agreements with Braintech. RVT, and Weidinger, are now trying to subvert those agreements via the sham purchase and setup of RVT.

**Defendants' Misconduct: Conversion of Robots**

38. In June of 2010, RVT and Braintech moved the Robots from Braintech's former Pontiac, Michigan facility without ABB's consent.

39. Counsel for ABB has repeatedly demanded a return of the Robots from counsel for RVT/Braintech.

40. While counsel for RVT and Braintech has informed ABB generally as to the whereabouts of the Robots (they are apparently in the Sterling Heights area), no specifics have been provided as to their location and when or where ABB can retrieve them. RVT/Braintech is therefore in unlawful possession of ABB's Robots.

**Defendants' Misconduct: Infringement of ABB Marks**

41. ABB has registered a series of marks with the United States Patent and Trademark Office (USPTO) that are a subject of this case: a) ABB, US Serial No. 76385320 (filing date March 18, 2002); (b) ABB, US Serial No. 76385322 (filing date March 18, 2002); (c) ABB, US Serial No. 76385319 (filing date March 18, 2002); (d) ABB, US Serial No. 75208225 (filing date December 3, 1996); (e) ABB, US Serial No. 74498063 (filing date March 7, 1994); (f) ABB, US Serial No. 74165392 (filing date March 30, 1993); and (g) ABB, US Serial No. 73728906 (filing date May 17, 1988). True and correct print-outs from the USPTO website describing these seven (7) marks are attached as **Exhibit F.** ABB refers to these marks collectively as the "ABB Marks" or the "Marks."

42. ABB has used the Marks in question for at least as long as the dates set forth in the registrations.

43. The ABB Marks embody the goodwill and business reputation of ABB's power automation, transmission, distribution and robotics businesses (among others). ABB operates businesses employing these marks in a multitude of locations both domestic and abroad, as it is present in 100 countries, with offices in 87 of those countries.

44. ABB has expended substantial resources developing and maintaining

substantial secondary meaning in each of the ABB Marks, ensuring that the ABB Marks serve as unique identifiers of ABB's various businesses.

45. ABB has done so by displaying the Marks in connection with ABB's goods and services on ABB's products, on its webpages, on its materials and literature and on its advertisements.

46. The red ABB logo depicted in those formats is famous worldwide and is associated only with ABB.  Customers, as a result, associate the ABB Marks with ABB, and the Marks are a valuable corporate asset.

47. The Braintech website today (http://www.braintech.com) continues to display the ABB Mark in connection with presenting ABB as a "client."

48. Defendant RVT has recently used the ABB Marks, at a minimum, on its website (http://www.roboticvisiontech.com/dotnetnuke/Home.aspx) to capitalize on the ABB Marks and their reputation in order to attract customers.

49. At various times, the RVT website has claimed (erroneously) that RVT is in "partnership" with ABB, and has displayed various images of the ABB Marks, again all in an effort to attract customers.

50. RVT's and Braintech's use of the ABB Marks has caused or is likely to cause confusion with the public about whether ABB has authorized or endorsed RVT's and Braintech's business operations, and whether ABB is affiliated with RVT/Braintech or not.

51. RVT's and Braintech's acts of trademark infringement have caused injury to, and are injuring ABB's business operations and opportunities, reputation, and goodwill.

**Defendants' Non-communication**

52. Since approximately May 2010, counsel for ABB has been in contact with at least three (3) different lawyers who claimed to or did in fact represent Braintech and/or RVT. These discussions focused on (a) ensuring ABB's continuing access to the software code and executables and (b) obtaining the return of the Robots.

53. After some initial discussions in mid to late June of 2010 between counsel for ABB and for RVT and Braintech, and between RVT's business principals and ABB's, RVT and Braintech simply stopped all communications for several weeks, forcing ABB to file its lawsuit on July 1, 2010. Since that time, counsel for RVT and/or Braintech have sporadically contacted counsel for ABB about various undefined "business relationships." However, it is my understanding they have steadfastly maintained that ABB is not entitled to access the code and executables – a right specifically set out in the agreements between ABB and the Braintech/RVT entities.

**Effect on ABB**

54. To me, this is a simple matter. ABB paid Braintech large sums of money to develop software, and to put that software in escrow if Braintech became insolvent or ceased operating. ABB did so in order to preserve its ability to service the customers which purchased the licensed products. ABB has now been cut-off from the code and executables via Braintech/RVT's corporate shell game.

55. The inability to access the code and executables is having a direct and irreparably damaging impact on ABB's robotics customers. We do not presently have the ability to service these robots, and need access to the code and executables to do so.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Dated: _August 3_____, 2010.

_James P. Connelly_
JAMES P. CONNELLY

**Exhibit A**

CONFIDENTIAL

ABB – Robot Automation
Efective April 1, 2006
Version #1.0

EXCLUSIVE GLOBAL CHANNEL PARTNER AGREEMENT

FOR THE LICENSING OF BRAINTECH'S

VISION GUIDED ROBOTICS TECHNOLOGIES

AND

SOFTWARE PRODUCTS

PARTIES:

1. BRAINTECH CANADA INC.

2. ABB INC.

1

CONFIDENTIAL

## TABLE OF CONTENT

|  |  | Page |
|---|---|---|
| Master Agreement |  | 01 |
| Exhibit 1. | Price List -- Software & Hardware | 21 |
| Exhibit 2. | Price List -- Braintech Services | 22 |
| Exhibit 3. | Discounts | 24 |
| Exhibit 4. | Trademarks | 25 |
| Exhibit 5. | Third Party Software Technology | 26 |
| Exhibit 6. | Sales and Marketing Agreement | 27 |
| Exhibit 7. | eVF Developer's Software License Agreement | 33 |
| Exhibit 8. | eVF Runtime Software License Agreement | 39 |
| Exhibit 9. | Price List - ABB Services | 43 |
| Exhibit 10. | ABB Sub-License Agreement | 44 |
| Exhibit 11. | Global Market SIC Codes | 45 |
| Exhibit 12. | Bin Picking Project | 46 |

CONFIDENTIAL

THIS MASTER AGREEMENT made the _5_ th day of May, 2006

BETWEEN:      BRAINTECH CANADA INC., a corporation duly organized and existing under the laws of British Columbia, Canada, with its principal office at 102-930 West 1st Street, North Vancouver, British Columbia, Canada V7P 3N4: (604) 9886440, fax (604) 986-6131 (hereinafter referred to as "BRAINTECH")


AND:      the Robotics Division of ABB Inc. ("ABB"), having a place of business at 1250 Brown Rd. Auburn Hills, MI. 48326-1507: (248) 391-8505, fax: (248) 391-8532 (hereinafter referred to as "LICENSEE ").


RECITALS:


A.      BRAINTECH has expertise in the software solutions development for vision guided robotic systems, including the technology and methods required to analyze and classify digital representations of images and visual patterns;

B.      BRAINTECH has developed valuable proprietary technology for use in the development of vision guided robotic systems, including the eVF software platform, SC3D guidance technology, and other software programs as declared in Exhibit 4 – "Trademarks;

C.      LICENSEE has expertise in the area of flexible automation equipment manufacturing and system integration;

D.      LICENSEE has developed a valuable network of business contacts and clients;

E.      BRAINTECH and LICENSEE believe that their respective technologies and expertise can be combined in industrial applications, which can employ the expertise and technology of both BRAINTECH and LICENSEE;

F.      BRAINTECH and LICENSEE now wish to enter into this Agreement. The purpose being to establish a leadership position in the "Vision Guided Robotics" market by providing certain guarantees to BRAINTECH in return for certain rights to LICENSEE, under terms and conditions as hereinafter specified by the agreement and its attached exhibits.

3



CONFIDENTIAL

AGREEMENT

1.  DEFINITIONS AND INTERPRETATION

When used herein, the terms below have the meaning as specified below, unless the context requires otherwise:

1.1.  "ABB robot" means all models of industrial robots manufactured by ABB Inc.

1.2.  "Agreement" means this agreement, including all of the exhibits, and any variation hereto agreed in writing between the Parties;

1.3.  "BRAINTECH Software" means eVF, Software Technology and Third Party Software Technology as computer programs specified in Exhibit 1 of Master Agreement in machine-readable object code form and any Improvements thereto. The BRAINTECH Software does not include source code;

1.4.  "Channel Partner" means a group or company acting as representative of BRAINTECH or LICENSEE directly or indirectly to the End-User;

1.5.  "Component" means a reusable software program that is available for use within eVF;

1.6.  "End-User" means any company that purchases the Products for use as part of their manufacturing process;

1.7.  "Engineering Services" means work performed by BRAINTECH using the BRAINTECH Software and hardware to develop a VGR Workspace or part of a VGR Workspace;

1.8.  "eVisionFactory and/or eVF" means the software system developed and owned by BRAINTECH which is used to develop, run and support VGR Workspaces;

1.9.  "Improvements" means any application specific software developments which are based upon or originate from the BRAINTECH Software, or which are developed utilizing knowledge and experience gained from the use of the BRAINTECH Software, whether made or developed by BRAINTECH, and which are used or for use in the Products;

1.10.  "Independent Technology" means technology either software or hardware that is not owned by Braintech;

1.11.  "Intellectual Property" or "IP" means all patents, utility models, designs, trademarks, copyrights and other intellectual property rights (or applications pending therefore);

1.12.  "License Owner" means BRAINTECH;



CONFIDENTIAL

1.13. "List Price" means the published price for the BRAINTECH Software;

1.14. Markets" means the automotive market and includes the manufacturing in whole or part of cars, trucks, and buses. This also includes tier suppliers to the automotive market of all levels. It also includes General Industry Markets as specified by their SIC codes and attached as EXHIBIT 11. It does not include the following markets: medical, government, aerospace, semi-conductor or food and beverage;

1.15. "Party" means a party to this Agreement;

1.16. "Products" means the complete system integrated with hardware components such as, but not limited to; a robot, an industrial PC, frame grabber, camera and/or lighting units; which use and embody the BRAINTECH Software whether or not they also incorporate Independent Technology and whether or not the BRAINTECH Software forms only part of the Products;

1.17. "Science Services" means the work and services performed by BRAINTECH to develop new algorithms or improvements to existing algorithms and techniques that will be used to develop a VGR Workspace or part of a VGR Workspace;

1.18. "Services" means the technical support and services set forth in Article 12 hereof consisting of Engineering Services and/or Science Services;

1.19. "Software Technology" means Components developed and owned by BRAINTECH and are available for use within eVF;

1.20. "Territory" means all countries world-wide;

1.21. "Term" means the period from April 1, 2006 to December 31, 2008, subject to conditions and extensions as provided for in Article 19 of this Agreement;

1.22. "Third Party Software Technology" means Components developed and owned by organizations other than BRAINTECH that are available for use within eVF;

1.23. "Trademarks" means all trade names and trademarks (or applications pending therefore) relating to the BRAINTECH Software owned or controlled by BRAINTECH as of the date hereof or issued to or otherwise acquired by BRAINTECH thereafter which are listed in EXHIBIT 4, attached hereto and made an integral part hereof;

1.24. "TrueView" means the LICENSEE's proprietary brand name for VGR systems using BRAINTECH Software;

1.25. "VGR" means Vision Guided Robotics and is used to describe the type of business that this Agreement covers;

5





1.26. "VGR Workspace" means a software program developed with eVF which is used to: capture a digital image; analyze the image for object identification, inspection and its spatial coordinates; and communicate instructions to a robot or other factory automation equipment.

1.27. "Workspace Developer" means the organization licensed by BRAINTECH to develop VGR Workspaces using the BRAINTECH Software;

## 2.   GRANT OF LICENSES

2.1.   BRAINTECH hereby grants to LICENSEE, an exclusive Global Channel Partner license, with the right to license to End-Users, under the BRAINTECH Software, including improvements, to make, have made, use, sell, or otherwise distribute the Products in every country in the Territory for the Markets defined in EXHIBIT 11;

2.2.   Exclusive Channel Partner license means that BRAINTECH will not license or sell the BRAINTECH Software to other potential Channel Partners including robot manufacturers, and manufacturing systems integrators or end users in the Territory for the Markets defined;

2.3.   BRAINTECH retains the right to sell BRAINTECH Software direct to the End-User and Channel Partners not included in the Markets defined in EXHIBIT 11;

2.4.   In such areas where Braintech is allowed to sell to end users, and when the End-User orders direct from BRAINTECH, BRAINTECH may contract LICENSEE for integration and support services subject to the End-Users acceptance;

2.5.   LICENSEE's standard integration and support services fees are setout in EXHIBIT 9;

2.6.   BRAINTECH hereby grants to LICENSEE an exclusive right to sub-license their Channel Partners to sell, install and support BRAINTECH Software in every country in the Territory for the Markets defined in EXHIBIT 11 and as per the terms and conditions defined in EXHIBIT 10 - Sub-License Agreement.

## 3.   EXCLUSIVE USE OF TRUEVIEW BRAND

3.1.   LICENSEE agrees to only use the TrueView brand with VGR systems that include Braintech Software;

## 4.   MINIMUM PURCHASE GUARANTEES

4.1.   In return for grant of Licenses, LICENSEE agrees to provide BRAINTECH with minimum purchase guarantees as per the following schedule and conditions.



CONFIDENTIAL

4.2. 2006 Order Commitment

    (a)   US$1,500,000;

    (b)   Payment based on systems delivered and invoiced throughout 2006;

    (c)   Balance due as balloon payment January 31, 2007.

4.3. Quarterly Purchase Commitments

    (a)   2007

| | |
|---|---|
| 1st QTR | US$750,000; |
| 2nd QTR | US$750,000; |
| 3rd QTR | US$1,000,000; |
| 4th Qtr | US$1,000,000. |

    (b)   2008

| | |
|---|---|
| 1st QTR | US$1,250,000 |
| 2nd QTR | US$1,250,000; |
| 3rd QTR | US$1,500,000; |
| 4th QTR | US$1.500,000. |

4.4   For 2007 and beyond, at end of each calendar Quarter, Braintech shall calculate for the LICENSEE the guaranteed quarterly purchase amount as specified for that quarter less all dollars invoiced in the same quarter;

4.5   LICENSEE will provide Braintech with a Purchase Order for a combination of eVF runtimes licenses equal to or as close as possible to but not less than the remaining amount owed;

4.6   Braintech will credit any partial license amount owing onto the first invoice of the next quarter.

4.7   In the absence of a commercially developed bin picking application product by January 1, 2008, the 2008 Purchase Commitments are reduced by $250K per quarter.

4.8   Effective January 1, 2008 BRAINTECH agrees to adjust its price list to take into consideration market pressures for equivalent competitive technology. Revenue minimums can then be adjusted per the appropriate Revenue/ License Price or other appropriate ratio.

## 5   TRADEMARKS

5.1      LICENSEE is granted a license and shall be entitled to use for the purposes of marketing, sales demonstration, quality assurance, testing and support any of BRAINTECH's Trademarks, Software Technology and/or eVF as the case may be in the Territory during the term of this Agreement.



CONFIDENTIAL

## 6   PRICES

6.1        The prices for all the BRAINTECH Software sold by BRAINTECH to LICENSEE hereunder shall, unless otherwise agreed upon, be quoted in US Dollars (US$);

6.2        The List Price for the BRAINTECH Software purchased hereunder shall be as is set out in the price list attached hereto as EXHIBIT 1 and made an integral part hereof;

6.3        The prices for Braintech provided maintenance, training, support, and engineering fees are set out in EXHIBIT 2 attached hereto and made an integral part hereof;

6.4        The prices set out in Exhibit 1 and Exhibit 2 are fixed for a term of one year from the effective date of this agreement.  BRAINTECH will provide LICENSEE with price changes 90 days before end of the one year term.  BRAINTECH will provide LICENSEE with immediate notice of additions and 30 days notice of deletions of products from the price list.

## 7   PRICE ADJUSTMENT

7.1        BRAINTECH will on a periodic basis or at the written request of LICENSEE, use current market information to establish a fair and competitive price for all BRAINTECH Software;

7.1.1  LICENSEE may at its own cost, request an independent arbitrator agreed upon by both parties to determine a fair market price for any/all BRAINTECH Software;

7.1.2  The outcome of the arbitration will be binding on both Parties.

## 8   DISCOUNTS

8.1        LICENSEE will receive discounts as set out in EXHIBIT 3, attached hereto and made an integral part hereof.

## 9   STANDARD PAYMENT TERMS

9.1        All payments for the BRAINTECH Software and Services sold by BRAINTECH to LICENSEE hereunder shall, unless otherwise agreed upon, be made by means of remittance to BRAINTECH's designated bank account by WIRE TRANSFER in the following manner:

To wire funds to our BRAINTECH Canada Inc. US dollar account, the following numbers are required:

|                    |        |
|--------------------|--------|
| Transit No.:       | 00010  |
| Institution No.:   | 003    |



CONFIDENTIAL

Account No.:        4019980

ABA No.:           ROYCCAT2

The bank address is:

Royal Bank of Canada

Royal Centre – Main Branch

1025 West Georgia Street

Vancouver, BC, Canada

V6E 3N9

Alternatively payments may be made by Company Check.

9.2        LICENSEE shall pay to BRAINTECH the full amount in US dollars the price for the BRAINTECH Software and/or Services purchased by LICENSEE pursuant to purchase orders issued by the LICENSEE to BRAINTECH.

## 10  DELIVERY

10.1        BRAINTECH agrees to make all delivery of the BRAINTECH Software hereunder at the earliest available date after each purchase order is issued by LICENSEE to BRAINTECH, and in any case BRAINTECH shall make delivery strictly in accordance with the terms and conditions stipulated in each such Purchase Order.;

10.2        BRAINTECH shall make all arrangements for any export licenses or permits which may be required in a timely manner;

10.3        LICENSEE shall acknowledge a Run-Time License as part of the proposal/order acknowledgement process.

## 11  INDIVIDUAL CONTRACTS FOR SPECIAL PURPOSE SITUATIONS

11.1        The detailed terms and conditions of each special purchase by LICENSEE from BRAINTECH of the BRAINTECH Software hereunder shall be mutually agreed upon at the time of each such special purchase and confirmed by both parties in a "Confirmation of Purchase Contract" to be issued by LICENSEE and countersigned and returned by BRAINTECH.  (Note: For greater clarity, BRAINTECH agrees to provide special terms, including pricing, and discounts, on a per merit basis as agreed upon by both parties necessary to meet market conditions.);

11.2        Each such special purchase contract between BRAINTECH and LICENSEE shall be

CONFIDENTIAL

deemed to incorporate all of the terms and conditions hereof to the extent that they may be applicable and are not inconsistent with the terms and conditions of said individual special purchase contract; provided, however, that the terms and conditions of this Agreement shall, in the event of a conflict, have precedence over those on the reverse side of the "Confirmation of Purchase Contract".

## 12  TECHNICAL SERVICES

12.1      BRAINTECH shall provide LICENSEE free of charge with all technical information used for: the purpose of VGR Workspace Development; manufacture of the Products; training and support in its possession relating to the BRAINTECH Software. In addition, BRAINTECH shall, from time to time, make available to LICENSEE free of charge any and all new technical information of the BRAINTECH Software, technical literature and the like necessary or useful in connection with the VGR Workspace Development and manufacture of the Products and effective use of the BRAINTECH Software;

12.2      In the case where the LICENSEE is developing a VGR Workspace, LICENSEE may require BRAINTECH to provide Engineering Services and/or Science Services.  In all cases, LICENSEE must provide BRAINTECH with such information, as LICENSEE may in its reasonable discretion deem necessary in order to enable BRAINTECH to provide Services to LICENSEE hereunder.

Such information may include:

Project Specifications
Sample Part(s) and/or
Sample Devices and/or
ABB robot software and/or
Sample Robots(s);

12.3      In the event LICENSEE requires BRAINTECH Engineering Services to help develop a VGR Workspace all such services shall be invoiced according to the terms and conditions set forth in Exhibit 2 – Services;

12.4      In the event LICENSEE requires BRAINTECH Science Services to help develop a VGR Workspace all such services shall be invoiced according to the terms and conditions set forth in Exhibit 2 - Services.

## 13  SALES AND MARKETING ACTIVITIES

13.1      LICENSEE has certain rights to market BRAINTECH Software Technology as part of the



CONFIDENTIAL

Products per the Sales and Marketing Agreement attached hereto as Exhibit 6.

## 14 BIN PICKING PROJECT

14.1        LICENSEE agrees to invest US$300,000 in Braintech's Bin Picking Project as defined in EXHIBIT 12 attached, under the following conditions:

14.2        LICENSEE will immediately pay US$150,000 to Braintech upon signing this Agreement;

14.3        LICENSEE will pay the balance of US$150,000 upon delivery of a prototype by Braintech as described in EXHIBIT 12;

14.4        BRAINTECH agrees to provide a special discount for the BIN PICKING components as specified in EXHIBIT 3;

14.5        LICENSEE is granted an exclusive license to use the Bin Picking components as part of eVF in the Territory for the Markets defined for as long as this Agreement is in effect;

14.6        LICENSEE has the right to match any offer to purchase BRAINTECH or ownership of BRAINTECH software.

## 15 BRAINTECH REPRESENTATION AND WARRANTY

15.1        BRAINTECH hereby represents and warrants that:

15.2        BRAINTECH owns its Proprietary Information as defined in Article 17 below, Trademarks, eVF or Software Technology, free and clear of any agreement and BRAINTECH is free to grant a license to use the same to LICENSEE as contemplated herein;

15.3        Proprietary Information of BRAINTECH, Trademarks, eVF or Software Technology constitutes the best available industrial property rights and technical information in the possession or under the control of BRAINTECH;

15.4        BRAINTECH is not restricted or prohibited from granting the license to use its Proprietary Information, Trademarks, eVF and/or Software Technology as contemplated herein, or from disclosing such Proprietary Information by any applicable law, regulation or order or by the terms of any other agreement to which BRAINTECH is a party or by which it is bound;

15.5        BRAINTECH warrants that the BRAINTECH Software shall be free of defect in design and workmanship. However, for greater clarity, such warranty does not apply to output, results, errors, or abnormal terminations or delays caused in whole or in part by (a) any functionality of software or products, including databases, not created by or licensed for use by BRAINTECH, whether or not such products or software are embedded in or form part of the Software Technology;

11



CONFIDENTIAL

(b) use of the Software Technology in combination with any other product not provided by BRAINTECH, except standard components that are considered part of a TrueView functional package such as ABB Robots, Sony cameras, mutually defined PC's, etc.; (c) any modification of the Software Technology made by a party other than BRAINTECH or authorized by BRAINTECH; (d) any data provided to the Software Technology by non-BRAINTECH products which does not adequately specify date data; or (e) LICENSEE'S failure to use the Software Technology in accordance with the Support Materials to be provided by BRAINTECH;

15.6    BRAINTECH warrants that the BRAINTECH Software sold and delivered hereunder shall have been produced in accordance with the then presently available best technical knowledge and for a period of twelve (12) months after LICENSEE'S delivery of the Products to its licensee or any other LICENSEE channel partner shall be free from all defects in software. In addition, and not by way of limitation of the foregoing, the BRAINTECH Software shall conform to any specifications mutually agreed upon between the parties;

15.7    In the event that, within the warranty period set forth in the foregoing Article 15.6, the BRAINTECH Software or part thereof is found to be defective or not in conformity with the agreed specifications, BRAINTECH shall, within thirty (30) days after receipt of the claim therefore from LICENSEE, repair or replace, at LICENSEE's sole option, such defective or non-conforming Technology or part thereof free of charge;

15.8    All transportation and other costs incurred in connection with the return of any defective or non-conforming part of the BRAINTECH Software or part thereof and the reshipment of such repaired Technology or part thereof or replacement therefore pursuant to the foregoing Article 15.7 shall be borne by BRAINTECH.

15.9    BRAINTECH shall indemnify and hold LICENSEE harmless from and against any loss, damage, cost, expense, claim or liability which may be incurred by or asserted against the LICENSEE as a result of any breach of the warranty contained in this Article 15.

16  NON-TRANSFER OF SECRETS

16.1    Source Code, flow diagrams and algorithms deemed secret by BRAINTECH are excluded and will not be shared with LICENSEE.

17  BRAINTECH INDUSTRIAL PROPERTY RIGHTS

17.1    BRAINTECH warrants that all Third Party Software Technology made available as components of eVF has been properly licensed from the licensors of all such Software Technology



CONFIDENTIAL

and that LICENSEE has the right to use and to include, and continue to use and include, such Third Party Software Technology as part of the Products at no charge (other than those expressly set forth in this Agreement). All such Third Party Software is listed in Exhibit 5;

17.2      BRAINTECH warrants that no part of its Proprietary Information, Trademarks, and Technology infringes any Intellectual Property including, but not limited to, patent, utility model, design, trade name, trademark and copyright belonging to any third party inside or outside the Territory;

17.3      BRAINTECH shall defend any legal action or other proceeding brought against LICENSEE, insofar as such legal action or other proceeding is based upon a claim that the Proprietary Information, Trademarks, Technology, or any part thereof, delivered to LICENSEE hereunder infringes any patent, utility model, design, trade name or trademark, copyright or other Intellectual Property belonging to any third party inside or outside the Territory.  LICENSEE shall notify BRAINTECH of the institution of any such legal action or other proceeding, and shall provide BRAINTECH with such assistance and cooperation in the defense of such legal action or other proceeding as BRAINTECH may reasonably request.  BRAINTECH shall have sole control over any such legal action or other proceeding and shall indemnify and hold LICENSEE harmless from and against all damages and costs awarded therein against LICENSEE;

17.4      In the event that the Proprietary Information, Trademarks, Technology, or any portion thereof, is held to infringe any Intellectual Property belonging to any third party and the use thereof is enjoined by a court of competent jurisdiction, BRAINTECH shall, at LICENSEE's sole option, either procure for LICENSEE the right to continue using such Proprietary Information, Trademarks, Technology, replace such Proprietary Information, Trademarks, Technology with a non-infringing one or modify such Proprietary Information, Trademarks,  Technology so that it becomes non-infringing.

18  LICENSEE INDUSTRIAL PROPERTY RIGHTS

18.1      LICENSEE shall defend any legal action or other proceeding brought against BRAINTECH, insofar as such legal action or other proceeding is based upon a claim that the LICENSEE'S Proprietary Information, Trademarks, Technology, or any part thereof infringes any patent, utility model, design, trade name or trademark, copyright or other Intellectual Property belonging to any third party inside or outside the Territory.  BRAINTECH shall notify LICENSEE of the institution of any such legal action or other proceeding, and shall provide LICENSEE with such assistance and cooperation in the defense of such legal action or other proceeding as LICENSEE



CONFIDENTIAL

may reasonably request.  LICENSEE shall have sole control over any such legal action or other proceeding and shall indemnify and hold BRAINTECH harmless from and against all damages and costs awarded therein against BRAINTECH;

18.2        LICENSEE shall indemnify and hold BRAINTECH harmless from and against any loss, damage, cost, expense, claim or liability which may be incurred by or asserted against BRAINTECH as a result of a failure for whatever reason of a TrueView system that does not result from an operation or instruction involving the BRAINTECH software.

19  TERM

19.1        Unless earlier terminated, this Agreement shall continue for an initial period ending December 31, 2008;

19.2        After the expiry of the initial period, this Agreement will be extended, upon the mutual consent of the parties, annually as long as the LICENSEE continues to provide BRAINTECH with a mutually agreed upon minimum quarterly purchase guarantee.

20  TERMINATION

20.1        Either Party may forthwith terminate this Agreement by notice to such effect to the other Party if the other Party commits a material breach of any term or condition contained in this Agreement (including the case in which any representations and warranties contained in Articles 17 and 18 hereof proves to have been incorrect or materially misleading when made) and, if such breach is capable of remedy, fails to remedy or begins to remedy the same within thirty (30) days after notice from the Party not in breach setting out the nature of such breach and demanding that the same be remedied;

20.2        Either Party may forthwith terminate this Agreement by notice to such effect to the other Party if bankruptcy, insolvency or reorganization proceedings, or other proceedings analogous in nature or effect, are instituted by or against the other Party, the other Party is dissolved or liquidated, whether voluntarily or involuntarily, a receiver or trustee is appointed for all or a substantial part of the assets of the other party or the other Party makes an assignment for the benefit of creditors;

20.3        LICENSEE may terminate this Agreement by notice to such effect to BRAINTECH if the price increases pursuant to Article 6.4 are greater than 5%;

20.4        Effective January 1, 2008 BRAINTECH and LICENSEE agree to grant each other cancellation rights should vastly superior technologies and/or market pricing pressures render either of our products non-saleable or non-competitive.





20.5     No termination of this Agreement, for whatever reason, shall affect any right or obligation of either party, which has accrued prior to the date of such termination;

20.6     In the event BRAINTECH enters into an agreement to sell its business, in whole or in part, LICENSEE shall have the right in its sole discretion to immediately terminate this agreement.

## 21  WAIVER AND VARIATION

21.1     A provision of or a right created under this Agreement may not be waived except in writing signed by the party granting the waiver and the Parties' rights and obligations under this Agreement may not be varied except in writing signed by the Parties. Waiver of any one breach of a term of this Agreement is not to be construed as a waiver of any subsequent breach of that term or of any other term.

## 22  RELATIONSHIP OF PARTIES

22.1     The relationship between the Parties is limited to the relationship created under the terms of this Agreement.

22.2     This Agreement is solely for the purposes set in this Agreement and not for any other purpose and nothing contained in this Agreement shall be deemed or construed as constituting either party as an agent or legal representative of the other party for any purpose whatsoever, or as conferring upon either party any right or authority to assume or create any obligation or responsibility, express or implied, orally or in writing, on behalf of or in the name of the other party or to bind the other party in any manner whatsoever;

22.3     Subject to Article 22.1 and 22.2 nothing contained in this Agreement will be construed as a limitation of the powers or rights of a Party to otherwise carry on its separate business for its sole benefit;

22.4     No Party will attempt to bind or impose any obligation upon the other Party or incur any joint liability without the mutual consent of that other Party except as set out in this Agreement;

22.5     Nothing contained herein is intended nor shall be interpreted to provide or create any third party beneficiary rights of whatever kind in any third party in any circumstance whatsoever.

## 23  GOVERNING LAW AND DISPUTE RESOLUTION

23.1     The Parties hereby agree that this Agreement is governed by the laws of the State of

15



CONFIDENTIAL

Michigan of the United States of America, without reference to the conflict of laws principles;

23.2     All disputes in connection with this Agreement are to be finally settle by binding arbitration in the State of Michigan of the United States of America, in accordance with the then existing Rules of Conciliation and Arbitration of the International Chamber of Commerce by three (3) arbitrators to be selected in accordance with said Rules.  Awards rendered therein shall be final and binding upon the parties hereto.

## 24  ENTIRE AGREEMENT

24.1     This Agreement constitutes the entire agreement between the Parties hereto and wholly cancels, terminates and supersedes all previous negotiations, agreements and commitments, whether formal or informal, oral or written, with respect to the subject matter hereof.

## 25  FORCE MAJEURE

25.1     If at any time owing to any circumstances beyond a Party's control ("Force Majeure") including but not limited to fire, explosion, war (whether declared or undeclared), civil commotion, strikes or any form of governmental intervention, a Party is prevented from fulfilling its obligations under this Agreement that Party will be entitled to give to the other written notice thereof (the "Force Majeure Notice") setting out as fully as possible the circumstances alleged to constitute the Force Majeure;

25.2     The Party giving the Force Majeure Notice will then be entitled to suspend the operation of this Agreement to the extent of its relevant inability to perform during a period equal to the duration of the event of Force Majeure specific in any such notice;

25.3     In the event of a Party giving a Force Majeure Notice the Parties must, at the request of either of them, meet and properly confer in good faith in an endeavor to reach a mutually acceptable solution with a view to alleviating any hardship or unfairness caused to any Party as a result of the event of Force Majeure;

25.4     Every Force Majeure Notice will be withdrawn by the Party giving it as soon as possible but in any event within forty-eight hours after the event of Force Majeure specified in the Force Majeure Notice has ceased to exist;

25.5     In the event that such Force Majeure continues for more that 6 calendar months then any Party may, by notice in writing to the other, require that the Parties commence negotiations




CONFIDENTIAL

with a view to arranging the termination of this Agreement;

26  NOTICES

26.1        Any notice, communication or other documents authorized or required to be given or served pursuant to this Agreement (in this clause referred to as a "Communication") must, unless otherwise specifically provided by this Agreement, be in writing addressed as appropriate to the relevant Party at it's address set out in this Article or to such other address as may be notified in writing by that Party to the other party from time to time as it's address for service and must be signed by an authorized representative of the party giving or serving the Communication. All Communications with BRAINTECH shall be in the English language;

26.2        A Communication must be delivered by hand or sent by prepaid certified mail requiring acknowledgment of delivery or by international courier delivery or (where appropriate reception facilities are available) sent by facsimile transmission or personal e-mail;

26.3        A Communication referred to in Article 26.2 which is delivered or received in full by facsimile transmission before 2:00 p.m. on a business day in the place in which it is delivered shall be deemed to be received on that day, and in any case other than hand delivery or facsimile transmission will be deemed to be received on the business day in the place of delivery next following the day of delivery or receipt;

26.4        A Communication which is sent by certified mail or courier delivery will be deemed to have been received on the date of delivery;

26.5        Article 26.2 and 26.3 (insofar as they relate to facsimile transmission) do not operate where the transmission by facsimile is not fully intelligible.  Transmission will be deemed to have been fully intelligible unless retransmission is requested within ten (10) working hours (being hours between 9:00 a.m. and 4:00 p.m. on a business day in the place of receipt) of completion of transmission;

26.6        Unless otherwise notified to the relevant parties, the address and facsimile number of the parties are as follows;

BRAINTECH:    BRAINTECH Canada Inc.
Address:          102-930 West 1st Street, North Vancouver,
                       British Columbia, Canada V7P 3N4
                       Attention: Babak Habibi
                       Fax:      (604) 986-6131



CONFIDENTIAL

LICENSEE:   the Robotics Division of ABB Inc.
Address:

1250 Brown Rd. Auburn Hills, MI. 48326-1507
Attention: Jerry Osborn
Fax:   (248) 391-8532.

## 27  ESCROW

27.1   In the event BRAINTECH ceases to operate either through bankruptcy or insolvency then the LICENSEE will be able to use the BRAINTECH Software in executable and where necessary source code form for the sole purpose of supporting systems installed and paid for by any of the LICENSEE'S End-Users facilities prior to the date of business cessation;

27.2   FOR GREATER CLARITY, THE LICENSEE HAS NO RIGHT OF OWNERSHIP OR RIGHT TO SELL THE BRAINTECH SOFTWARE IN THE EVENT THAT BRAINTECH CEASES TO OPERATE FOR WHATEVER REASON;

27.3   Copies of the executables and source code will be kept at the Law Offices of:

Clark Wilson
800 – 885 West Georgia Street,
Vancouver, BC V6C 3H1
(604) 643-3153
ATTN: Bernard Pinsky

## 28  GENERAL

28.1   The headings of this Agreement are inserted for convenience of reference only and shall not affect the construction or interpretation hereof;

28.2   Failure or omission by a Party at any time to enforce or require strict or timely compliance with any provision of this Agreement does not affect or impair that provision in any way or the rights of that Party to avail itself of the remedies which that Party may have in respect of any breach of that provision;

28.3   This Agreement may be executed by the Parties in one or more counterparts and the executed counterparts when taken together are to constitute the one agreement and shall be deemed to have been executed by the exchange between the Parties by each Party by

18



CONFIDENTIAL

facsimile of a single counterpart signed by that party;

28.4        Any amendment to this Agreement must be in writing signed by a duly authorized representative of the Parties;

28.5        This Agreement shall be binding upon and inure to the benefit of the BRAINTECH and LICENSEE, and their respective successors and permitted assigns;

28.6        Neither BRAINTECH nor LICENSEE shall assign, transfer or otherwise dispose of its rights or obligations under this Agreement, in whole or in part, without the prior written consent of the other Party;

28.7        The Parties shall perform their respective duties under this Agreement, subject to all applicable laws, regulations, procedures, ordinances and rulings of any governmental authority with appropriate jurisdiction;

28.8        LICENSEE will use its reasonable efforts, with the cooperation of BRAINTECH to obtain any necessary approval of this Agreement by any governmental authorities with appropriate jurisdiction and to obtain the consent of any governmental authorities to the remittance of payments under this Agreement in accordance with its terms, in the event that these consents are necessary;

28.9        If the whole or any part of a provision of this Agreement is or shall become void, unenforceable or illegal, the remainder of this Agreement shall have full force and effect. The Parties agree that in such case, the provision held void, unenforceable or illegal shall be replaced by such provision which in its commercial and legal context is most similar to the provision held void, unenforceable or illegal;

28.10        All notices to third parties and all publicity concerning the terms and conditions of this Agreement shall be jointly planned and coordinated by and between the Parties.  None of the Parties shall act unilaterally in this regard without the prior written approval of the other parties. It is expected that the Parties shall mutually agree upon a press release which is issued after the effective date of this Agreement;

28.11        Non-Solicitation

Each party agrees that during the term of this Agreement, and for a period of six months following termination of this Agreement, it will not solicit, entice, persuade or induce any individual who currently is, or at any time during the term of this Agreement shall be, an employee of the other party, to terminate or refrain from renewing such individual's employment;





28.12    Currency

All references to currency are deemed to mean lawful money of the United States of America unless expressed to be in some other currency.

28.13    Export of Software

LICENSEE agrees that it will not export or re-export the Licensed Materials or any copies thereof, either directly or indirectly, outside of the country in which the Licensed Materials are delivered to LICENSEE except in compliance with all applicable laws, ordinances and regulations. LICENSEE shall have the exclusive obligation to ensure that any export of the Licensed Materials are in compliance with all applicable export laws and the laws of any foreign country;

In Witness Whereof, the parties hereto have caused this Agreement to be executed by their respective, duly authorized representative on the day and year first above written.

Accepted by
BRAINTECH Canada Inc.

Per: _____
Authorized Signature

Name: Owen Jones
Title: CEO

Date: _May 5th, 2006_

LICENSEE

Per: _____
Authorized Signature

Name: _A. Goos_
Title: _BU Manager Robot Automation_

Date: _May 19th, 2006_



CONFIDENTIAL

## EXHIBIT 1

Pricing

Runtime Licenses per Package
eVF Standard Platform ver.XX
Includes: 2D imaging and guidance library c/w hw key
      1 gray scale 640X480 camera connection
      1 robot connection                                   1,895.00

Options: (software only)
| | |
|---|---|
| 1 extra camera connection | 2,000.00 |
| 1 extra robot connection | 1,500.00 |
| Advanced Imaging module* (AIM) | 6,000.00 |
| IDM guidance module (AIM not included) | 10,000.00 |
| SC3D guidance module (AIM not included) | 19,000.00 |
| DD3D guidance module (AIM not included) | 16,000.00 |
| 1 extra DD3D camera/sensor group | 4,200.00 |
| Color camera module | 1,000.00 |
| Hi-res camera module | 1,500.00 |
| Hi-speed camera module | 1,000.00 |

   *Modules priced per PC
   *Product Warranty included (1 yr.)

**************************************************************

Solution Warranty
Workspace fee (20% of total license per system X # systems)

Hardware (reference only)
| | |
|---|---|
| Standard IBM M Pro Vision PC/monitor/KB | 1,504.00 |
| Stealth Industrial PC/monitor/KB | 3,290.00 |
| Frame Grabber (including its cable) | 755.00 |
| Camera+Lens+Enclosure | 750.00 |
| Lighting (Fluorescent from SY) | 495.00 |
| Lighting (LED BALA from AI, incl. p/s) | 1,000.00 |
| UPS | 400.00 |
| Calibration Template | 130.00 |
| Structured Lighting Projector | 800.00 |
| Additional Cost (special cabling, power supply, etc.) | 300.00 |
| Industrial Cabinet/Enclosure | 2,500.00 |

NOTES:
All prices are in U.S. dollars
Discounts apply to "Runtime Licenses and Options" only



CONFIDENTIAL

## EXHIBIT 2

**BRAINTECH Services**

| Item | Description | Supplier | $Price | Qty. | $Total |
|---|---|---|---|---|---|
| | LICENSE & SUPPORT | | | | |
| 1 | eVF Developers License | BRAINTECH | $5,500.00 | 1 | $5,500.00 |
| | Includes: | | | | |
| | eVF Expert Security H/W key | | | | |
| | eVF Software Installation CD | | | | |
| 2 | Matrox Imaging Library (advanced version) | MATROX | $1,125.00 | 1 | $1,125.00 |
| 3 | Annual Partner Support & Maintenance Package[1] | BRAINTECH | $4,100.00 | 1 | $4,100.00 |
| | *Cost Per eVF Developers License (seat) and one year support & Maintenance Package!→* | | | Total | $10,725.00 |
| | TRAINING | | | | |
| 1 | eVF Developers Training | BRAINTECH | $7,500.00 | 1 | $7,500.00 |
| | 5 days, up to 5 attendees | | | | |
| | *Cost for group of 5→* | | | Total | $7,500.00 |

Notes
- This quotation is valid for 30 days
- All prices are in US dollars
- Prices do not include taxes travel, or shipping charges; third party prices are subject to change without notice
- If applicable, robots, PLCs or other peripheral devices are to be provided by customer.
- If applicable, catering services are to be coordinated and covered by customer.

Volume Discounts For Developers License:

| Number of Licenses | Developers License (per license) |
|---|---|
| 1-3 | 5,500.00 |
| 4-8 | 4,850.00 |
| 8+ | 4,500.00 |

---

[1] The support package is renewed by the developers annually; see Attached Development Software

Support Agreement for details

22





**EXHIBIT 2 Continued**

BRAINTECH Services Fees

1.  Training

There are three levels of training available:

1.  L1 – (Operator): eVF training for users at the OPERATOR Access level, (typically the end user on the factory floor);
2.  L2 – (Administrator Level): eVF training for users at the ADMIN Access level, (typically a technician either of the end-user or the systems integrator);
3.  L3 – (Developer Level): eVF training for users at the EXPERT level, (typically a licenses application developer)

Training time is relative to the Access level required with the least time for Operator and most for EXPERT.

2.  Engineering and Science Services

| Type of Service | Rate |
| --- | --- |
| New Workspace Development/Modification | US$85.00 /hr. |
| Component Development/Enhancement | US$130.00/hr. |
| Prototyping | US$ 85.00/hr. |
| Feasibility Research | US$/85.00/hr. |
| On-Site Commissioning | US$1200/day |

Plus travel expenses, plus per diem meals at US$50/day



CONFIDENTIAL

EXHIBIT 3

Discounts

ABB Direct Sales Discount:

> 25% off first 100 runtime licenses and options sold per year and referenced in Exhibit 1;

ABB Channel Partner Discount:

> 35% off runtime license and options referenced in Exhibit 1

> 50% off Solution Warranty fee as referenced in Exhibit 1

Bin Picking Discount

> 40% off bin picking runtime modules as referenced in Exhibit 1



CONFIDENTIAL

**EXHIBIT 4**

Trademarks

BRAINTECH Trademarks:

eVisionFactory

eVF

SC3D

AutoCal

Autotrain

Xi2D

IDM

DD3D

SR3D

SL3D

RTPT

BRAINTECH



**EXHIBIT 5**

**Third Party Software Technology**

1. Matrox Electronic Systems Ltd.

   Legal Department

   1055 St. Regis Blvd.

   Dorval, Quebec H9P 2T4

   Canada





Exhibit 6

Sales and Marketing Agreement

Between

BRAINTECH Canada Inc. ("BRAINTECH")

102 – 930 West 1st Street

North Vancouver, British Columbia

V7P 3N4

and

LICENSEE NAME:

the Robotics Division  of ABB Inc. ("LICENSEE"),

1250 Brown Rd. Auburn Hills, MI.

48326-1507

Effective Date: April 1, 2006

IN CONSIDERATION of the mutual promises contained herein, the parties agree as follows:

1.  Definitions

In this Agreement and in the recitals and Schedules, unless otherwise specified or patently required by the context, the words and phrases defined in the recitals and elsewhere in this Agreement shall have the meanings ascribed to them therein or in the Master Agreement or Exhibits thereto, and the following words and terms shall have the respective meanings ascribed to them as follows:

1.1.  "Confidential Information" means all information marked "confidential", "restricted" or "proprietary" by either party and, in the case of BRAINTECH, includes the Licensed Materials and Program Concepts and such other information, data, and materials of BRAINTECH or licensors of BRAINTECH or their affiliates disclosed to LICENSEE or its affiliates hereunder, and in respect of LICENSEE also includes all LICENSEE Data;

1.2.  "Deliverable" means the BRAINTECH Software and Support Materials;

1.3.  "Ingredient Brand" means a BRAINTECH logo as supplied by BRAINTECH to be attached and made visible on all TrueView systems, printed and electronic material;

1.4.  "Key" means a hardware key(s) provided by BRAINTECH required to use the BRAINTECH Software;



CONFIDENTIAL

1.5.   "LICENSEE Data" means all data and information, however recorded, provided to BRAINTECH by LICENSEE to enable BRAINTECH to provide LICENSEE Support Services under this Agreement;

1.6.   "LICENSEE Support Services" means services supplied to LICENSEE for the initial and continued operation and use of the BRAINTECH Software as particularized in the Master Agreement, Section 9;

1.7.   "Licensed Materials" means the BRAINTECH Software and Support Materials, however recorded, fixed, stored or embodied;

1.8.   "Specifications" means in relation to BRAINTECH Software, the Support Materials pertaining to such BRAINTECH Software;

1.9.   "Support Materials" means any documentation or manuals and Updates thereto related to the BRAINTECH Software supplied to LICENSEE by BRAINTECH to assist LICENSEE in using the BRAINTECH Software;

1.10.  "Updates" means the updates, program corrections, patches, modifications, or enhancements to computer programs or support materials which may be delivered to LICENSEE;

1.11.  "TrueView" means the LICENSEE's proprietary brand name for VGR systems using BRAINTECH's software;

1.12.  "VGR" means Vision Guided Robotics.

## 2.   AUTHORIZATION

2.1.   The LICENSEE hereby authorizes BRAINTECH to make representations to potential End-User that BRAINTECH has established an alliance with the LICENSEE; and as a result of that alliance, BRAINTECH can make the services and expertise of the LICENSEE available to potential End-User;

2.2.   In making such representations, BRAINTECH is authorized to distribute the LICENSEE's promotional literature and other promotional products to potential End-User;

2.3.   BRAINTECH hereby authorizes the LICENSEE to make representations to potential End-Users of the LICENSEE to the effect that LICENSEE has established an alliance with BRAINTECH; and as a result of that alliance, the LICENSEE can make the services, expertise, and proprietary technology and products of BRAINTECH available to potential End-User;

2.4.   In making such representations, the LICENSEE is authorized to distribute BRAINTECH's





promotional literature and other promotional products to potential End-User.

3.   MARKETING and SALES COOPERATION

3.1.   Joint Marketing Activities

3.1.1 Each party agrees to participate in marketing activities including; trade shows, informational seminars, and public relations type activities, (media exposure) and advertising as defined and agreed on a case-by-case basis.

3.2.   End-User Defined Opportunities

3.2.1 Each party agrees that, upon becoming aware of a new application opportunity to design, develop, market, or install a VGR system which can potentially utilize, in a substantial way, the expertise and technologies of both BRAINTECH and the LICENSEE (an "Opportunity") it will:

(a)   advise the potential End-User of its alliance with the other party, and of the expertise and technology of the other party; and

(b)   advise the other party of the Opportunity;

3.2.2 Upon identifying an Opportunity, the parties will cooperate to obtain such contracts or business as can be obtained arising from the Opportunity. In doing so, the parties will use their reasonable best efforts to implement the following steps and procedures:

(a)   The parties will establish a reasonable division of work and responsibility, having to do with their respective areas of expertise and technologies;

(b)   The parties will cooperate in preparing feasibility studies as may be beneficial in pursuit of the Opportunity. In doing so, each party will prepare estimates of its expected cost in completing the areas of work which may be assigned to it.

3.3.   BRAINTECH agrees to work exclusively with LICENSEE in pursuing any Opportunity in the Territory for the Markets described in the Master Agreement.

3.4.   LICENSEE agrees, to the greatest extent reasonably practicable, to work exclusively with BRAINTECH in pursuing any Opportunity in the Territory for the Markets described in the Master Agreement. For greater certainty, this section will not require LICENSEE to work exclusively with BRAINTECH if it has a bona fide business reason for not doing so. Examples of Bona fide business reasons are:





(a)     Inability of the other party to supply expertise or technology which is important to pursuit of the Opportunity; or

(b)     Inability of the parties, despite their reasonable best efforts, to agree on any business or technical issues important to the pursuit of the Opportunity.

(c)     End user customer specification.   Even in such case customer specifies a non-Braintech solution, LICENSEE will make every reasonable effort to convert to a Braintech solution.

4.   SERVICE AND SUPPORT

4.1.   LICENSEE agrees, for a fee to provide End-Users with integration, installation, training and annual VGR system support and maintenance;

4.2.   LICENSEE agrees to maintain an adequate number of trained personnel to install, service and support TrueView installation world-wide;

4.3.   BRAINTECH agrees to provide the LICENSEE with eVF "L2 certification at its Vancouver premises, at no charge to LICENSEE exclusive of travel and living expenses;

4.4.   BRAINTECH agrees to provide the LICENSEE with specific VGR software solutions maintenance and operations training at LICENSEE's Auburn Hills, MI premises.

5.   INTELLECTUAL PROPERTY RIGHTS

5.1.   LICENSEE acknowledges that (except to the extent that such have been licensed by BRAINTECH from third parties) BRAINTECH owns all title and intellectual property rights, copyright, moral rights, and patent rights in and to the inventions, designs, products, hardware, software, and programs listed in the Master Agreement Exhibit 1 (the "BRAINTECH Technology"). Nothing in this Agreement shall constitute a grant, transfer, or assignment to LICENSEE of any of the foregoing rights, or any license to use any BRAINTECH Technology except as expressly permitted by the Agreement or otherwise agreed to;

5.2.   LICENSEE shall not reverse engineer, de-compile, or disassemble any BRAINTECH Proprietary Technology, except any only to the extent that such activity is expressly permitted by applicable law notwithstanding this limitation;

5.3.   LICENSEE further acknowledges that information provided by BRAINTECH to LICENSEE concerning the BRAINTECH Technology shall constitute proprietary and confidential information belonging to BRAINTECH. LICENSEE shall not disclose, and shall keep

30

CONFIDENTIAL

confidential, all such information. This provision shall not apply to information which (i) is or becomes part of the public domain through no act or omission of the LICENSEE (ii) LICENSEE receives form a third party acting without any obligation or restriction of confidentiality in favor or BRAINTECH, (iii) BRAINTECH releases from confidential treatment by written consent, (iv) LICENSEE is required by any applicable law or court order to disclose, or (v) is independently developed by LICENSEE;

5.4.   LICENSEE warrants that it will not knowingly convert to their own use or to the use of any other party any industrial secrets or trade secrets owned by BRAINTECH and obtained by LICENSEE or its personnel by reason of this Agreement or otherwise;

5.5.   BRAINTECH shall not reverse engineer, de-compile, or disassemble any LICENSEE Proprietary Technology, except and only to the extent that such activity is expressly permitted by applicable law notwithstanding this limitation;

5.6.   BRAINTECH warrants that neither it nor any of its employees will knowingly convert to their own use or to the use of any other party any industrial secrets or trade secrets owned by the LICENSEE and obtained by BRAINTECH or its personnel by reason of this Agreement or otherwise;

5.7.   BRAINTECH further acknowledges that information provided by the LICENSEE to BRAINTECH concerning LICENSEE Proprietary Technology shall constitute proprietary and confidential information belonging to the LICENSEE. BRAINTECH shall not disclose, and shall keep confidential, all confidential and proprietary information provided by the LICENSEE or any subsidiary or agent of the LICENSEE relating to any LICENSEE Proprietary Technology. This provision shall not apply to information which (i) is or becomes part of the public domain through no act or omission of BRAINTECH, (ii) BRAINTECH receives from a third party acting without any obligation or restriction of confidentiality in favor of LICENSEE, (iii) LICENSEE releases from confidential treatment by written consent, (iv) BRAINTECH is required by any applicable law or court order to disclose, or (v) is independently developed by BRAINTECH;

5.8.   Each party further acknowledges that a violation of this Article 5 may cause irreparable harm to the other party for which no adequate remedy in damages exists, and each party therefore agrees that, in addition to any other remedies available, a party will be entitled to seek equitable remedies, including without limitation injunctive relief, to enforce the obligations set forth in this Article 4.

6.   DISCLAIMER OF AGENCY OR PARTNERSHIP STATUS

31





6.1.   Nothing in this Agreement shall create any relationship of partnership between BRAINTECH and LICENSEE. Neither party shall represent to any third person that the relationship between BRAINTECH and LICENSEE is anything other than that of independent contractors;

6.2.   Neither BRAINTECH's nor LICENSEE's officers, employees or agents shall be deemed officers direct or indirect employees, or agents of the other.

## 7.   TERM AND TERMINATION

7.1.   Subject to the provisions of the Master Agreement, Section 15, the term of this Agreement shall commence on the Effective Date and will continue until terminated in accordance with the Master Agreement, Section 15 therein;

7.2.   Forthwith upon termination of this Agreement, each party shall cease;

7.2.1 any and all presentations, solicitations, or other marketing activities relating to the other party's products and services; and

7.2.2 Representing or holding itself out as being authorized to market, advertise or promote in any way the products of the other party.

## 8.   OTHER CONDITIONS AND PROVISIONS

8.1.   LICENSEE agrees that all TrueView physical systems as well as all sales, marketing, support and training materials, (whether in print or electronic format) to the extent reasonably practicable must clearly display an Ingredient Brand notice that attributes ownership of BRAINTECH Software to BRAINTECH.

In Witness Whereof, the parties hereto have caused this Agreement to be executed by their respective, duly authorized representative on the day and year first above written

BRAINTECH CANADA, INC.                              ABB INC.

Signature                                           Signature

Owen Jones                                          Al Gros
Name                                                Name

May 5th, 2008                                       May 19th, 2006
Date                                                Date

32



CONFIDENTIAL

EXHIBIT 7

eVF DEVELOPER'S SOFTWARE LICENSE AGREEMENT

Between

> BRAINTECH Canada Inc. ("BRAINTECH")
> 102 -- 930 West 1st Street
> North Vancouver, British Columbia
> V7P 3N4

and

LICENSEE NAME:

> the Robotics Division  of ABB Inc. ("LICENSEE"),
> 1250 Brown Rd. Auburn Hills, MI.
> 48326-1507

Effective Date: April 1, 2006

IN CONSIDERATION of the mutual promises contained herein, the parties agree as follows:

1.  **Definitions**

In this Agreement and in the recitals and Schedules, unless otherwise specified or patently required by the context, the words and phrases defined in the recitals and elsewhere in this Agreement shall have the meanings ascribed to them therein or in the Master Agreement or Exhibits thereto, and the following words and terms shall have the respective meanings ascribed to them as follows:

(1)   Affiliate or affiliate means with respect to a party, any entity at any time controlling, controlled by or under common control with, such party.  The term "Control" as used in this Agreement shall mean the legal, beneficial or equitable ownership, directly or indirectly, of more than 50% of the aggregate of all voting equity interests in such entity;

(2)   Designated Computer means the computer equipment designated in writing by LICENSEE and



CONFIDENTIAL

accepted in writing by BRAINTECH equipped with the appropriate hardware to allow activation and use of the BRAINTECH Software with a Key;

(3)   Designated Site means the location controlled by LICENSEE where the Designated Computer is located;

(4)   Program Concepts mean the techniques, concepts, know-how, and ideas, used, embodied, or expressed in the BRAINTECH Software, including without limitation program and data structure, sequence, and organization, interfaces, field and data definitions and relationships, data and database models, and designs;

(5)   Use in relation to the BRAINTECH Software means the right to (a) copy the BRAINTECH Software to install it on the Designated Computer, (b) use the BRAINTECH Software to develop programs for the End-User(c) display at the Designated Site text and other images generated by the BRAINTECH Software during processing on the Designated Computer and (d) make up to two (2) copies of the BRAINTECH Software for back-up or archival purposes.  LICENSEE shall not have the right and agrees not to copy or store the BRAINTECH Software on any computer other than the Designated Computer at the Designated Site; and

(6)   User means an individual who uses the BRAINTECH Software.

2.   License to LICENSEE

(1)   Subject to BRAINTECH's rights under Section 7, BRAINTECH grants to LICENSEE a personal, non-transferable, non-assignable, and non-exclusive license to Use the BRAINTECH Software on the Designated Computer at the Designated Site;

(2)   Except for the rights to Use the BRAINTECH Software expressly conferred on LICENSEE by Section 2(1) LICENSEE shall not have the right and agrees not to copy or reproduce the BRAINTECH Software or any part thereof. Without limiting the generality of the foregoing, except as permitted by law, LICENSEE shall not copy, disassemble, de-compile, translate or convert into human readable form, or reverse engineer, all or any part of the BRAINTECH Software, and shall not use the BRAINTECH Software, Program Concepts, or Support Materials to develop any derivative works or any functionally compatible or competitive software. LICENSEE shall not have the right, and agrees not to copy or reproduce the Support Materials;

(3)   LICENSEE may sublicense programs developed using the BRAINTECH Software and Modules thereof (the "Program") to the End-User on the following conditions:



CONFIDENTIAL

(a)  LICENSEE will include a copy of the Runtime License, (EXHIBIT 8) with its proposal;

(b)  End-User will require a Key from BRAINTECH to run the Program;

(c)  The LICENSEE must pay BRAINTECH a Run-Time license fee as specified in the Master Agreement, Section 4 and 5 for every Product shipped to the End-User according to the payment terms as specified in the Master Agreement, Section 6.

(d)  LICENSEE agrees to have two(2) developers trained at BRAINTECH's Vancouver Center;

(e)  Developers are trained and certified L3;

(f)  BRAINTECH agrees to waive training fee for two (2) only Developers.

(4)  LICENSEE may sub-license programs developed using the BRAINTECH Software and Modules thereof (the "Program") to the SUB-LICENSEE on the following conditions:

(a)  SUB-LICENSEE will include a copy of the Runtime License, (EXHIBIT 8) with its proposal;

(b)  End-User will require a Key from BRAINTECH to run the Program;

(c)  The LICENSEE must pay BRAINTECH a Run-Time license fee as specified in the Master Agreement, Section 4 and 5 for every Product shipped to the SUB-LICENSEE according to the payment terms as specified in the Master Agreement, Section 6.

(d)  SUB-LICENSEE agrees to have one(1) technician trained and certified "L2" at an authorized ABB training center .

3.  User Acceptance Testing and Warranties of BRAINTECH

(1)  LICENSEE agrees that upon delivery to it of a Deliverable, LICENSEE will test such Deliverable to determine whether it conforms to the Specifications. LICENSEE will have thirty, (30) days (or such other period as the parties may agree in writing) (the "Approval Period") to do such testing. LICENSEE agrees to notify BRAINTECH in writing of all failures of the Deliverable to meet the Specifications encountered during the Approval Period (such failures are referred to here as "Deficiencies"). If LICENSEE does not notify BRAINTECH in writing of any Deficiencies within the Approval Period, the Deliverable shall be deemed to be accepted. Following the end of the Approval Period, LICENSEE and BRAINTECH shall meet and agree upon the classification of any Deficiencies. Deficiencies shall be classified as either (a) a "Material Deficiency" in the event the Deficiency causes the Deliverable to materially fail to meet the Specifications, such that there is resultant system failure or outage, the production of consistent functionality errors which result in data loss, or the production of operational problems that materially impact on the



LICENSEE 's business needs, b) a "Non-Significant Deficiency" if the Deficiency causes the Deliverable not to meet the Specifications and such failure negatively impacts the use of the Deliverable as contemplated by the Specifications, insofar as there is a serious problem or design flaw which results in functional errors, but which can be managed with a temporary adaptation or with Hot Line Support, (c) a "Cosmetic Deficiency" if the Deficiency is not a Material Deficiency nor a Non-Significant Deficiency, but a minor software error which may affect the appearance of the data, the Graphical User Interface or low priority functions but does not result in a serious functional error. BRAINTECH shall use commercially reasonable efforts to promptly correct or have corrected or provide LICENSEE with a work around for the Deficiencies or request its licensors to correct or provide a work around for the Deficiencies. The Deliverable shall be deemed to be accepted when BRAINTECH shall have delivered to LICENSEE corrections and/or workarounds for all Material Deficiencies and Non-Significant Deficiencies and LICENSEE, after having had twenty (20) business days within which to test such corrections and/or workarounds, notifies BRAINTECH that such Deficiencies have been resolved to the LICENSEE 's satisfaction. If BRAINTECH, after using commercially reasonable efforts has not provided LICENSEE with a correction or workaround for such Deficiencies within the time specified above, then, at BRAINTECH's sole option, BRAINTECH will promptly and in any event within ten (10) days, refund the license fee and taxes thereon paid by LICENSEE to BRAINTECH for the Deliverable, provided that LICENSEE returns the Deliverable and related Support Materials to BRAINTECH. Subject to the provisions of Section 8(2) these remedies are LICENSEE 's sole and exclusive remedies and BRAINTECH's sole obligations for any non-conformities, defects, or errors, failure to meet Specifications, and all performance or non-performance problems related to the Licensed Materials;

(2)    BRAINTECH warrants that the BRAINTECH Software will be capable of performing according to the Specifications. However, for greater clarity, such warranty does not apply to output, results, errors, or abnormal terminations or delays caused in whole or in part by (a) any functionality of software or products, including databases, not created by BRAINTECH, whether or not such products or software are embedded in or form part of the BRAINTECH Software; (b) use of the BRAINTECH Software and Updates in combination with any other product not provided by BRAINTECH; (c) any modification of the BRAINTECH Software or Updates made by a party other than BRAINTECH or authorized by BRAINTECH; (d) any data provided to the BRAINTECH Software by non-BRAINTECH products which does not adequately specify date data; or (e) LICENSEE 's failure to use the BRAINTECH Software in accordance with the Support Materials. If the BRAINTECH Software does not function substantially as described according to the Specifications during the period from the delivery thereof to LICENSEE until *[insert warranty expiration period]* (the "Warranty Period"), BRAINTECH will, if it is able to

36



CONFIDENTIAL

reproduce or verify the non-conformity do one of the following, namely, make commercially reasonable efforts to correct or have corrected or provide LICENSEE with a work around for the non-conformity, or at BRAINTECH's sole option, refund the license fee paid by LICENSEE to BRAINTECH for such software, provided that LICENSEE returns such software and the applicable Support Materials to BRAINTECH within thirty (30) days following the expiry of the Warranty Period. These remedies are LICENSEE 's sole and exclusive remedies and BRAINTECH's sole obligations for any non-conformities, defects, or errors and all performance or non-performance problems related to the BRAINTECH Software;

(3) BRAINTECH EXPRESSLY DISCLAIMS ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS EXPRESS OR IMPLIED NOT CONTAINED HEREIN, INCLUDING BUT NOT LIMITED TO, REPRESENTATIONS, WARRANTIES AND CONDITIONS OF QUALITY, PERFORMANCE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND THOSE ARISING BY STATUTE OR OTHERWISE IN LAW OR FROM A COURSE OF DEALING OR USAGE OF TRADE;

(4) IN NO EVENT WILL BRAINTECH BE LIABLE FOR SPECIAL, INCIDENTAL, INDIRECT, OR CONSEQUENTIAL LOSS OR DAMAGE, LOST BUSINESS REVENUE, LOSS OF PROFITS, LOSS OF DATA, FAILURE TO REALIZE EXPECTED PROFITS OR SAVINGS OR OTHER NON-DIRECT COMMERCIAL OR ECONOMIC LOSS OR DAMAGE OF ANY KIND OR ANY CLAIM AGAINST LICENSEE BY ANY OTHER PERSON (EVEN IF BRAINTECH HAS BEEN ADVISED OF THE POSSIBILITY OF ANY SUCH LOSS OR DAMAGE);

(5) WITH THE EXCEPTION OF CLAIMS UNDER SECTION 9.1 HEREIN, BRAINTECH'S MAXIMUM LIABILITY UNDER THIS AGREEMENT TO LICENSEE SHALL IN NO EVENT EXCEED, IN THE AGGREGATE IN RESPECT OF ALL CLAIMS, THE AMOUNT PAID BY LICENSEE UNDER THIS AGREEMENT IN THE TWELVE (12) MONTH PERIOD BEGINNING WHEN THE CAUSE OF ACTION FIRST AROSE EVEN IF THE CAUSE OF ACTION IS A CONTINUING ONE;

(6) BRAINTECH does not warrant that the BRAINTECH Software will operate uninterrupted or error free. BRAINTECH has no control over the conditions under which LICENSEE may use the BRAINTECH Software and BRAINTECH does not and cannot warrant the results that may be obtained from its use. LICENSEE is solely responsible for (a) the suitability of the BRAINTECH Software to meet LICENSEE 's requirements, (b) the suitability and overall effectiveness and efficiency of the Designated Computer upon which the BRAINTECH Software is to operate, even if it has been supplied by BRAINTECH, (c) the provision of all data, and all data entry, and conversion of data, (d) the furnishing of any supplies and forms, (e) assuring the existence of



adequate back-up plans to accommodate any failure of the Designated Computer or the BRAINTECH Software, (f) backing up the BRAINTECH Software and all associated files, including when LICENSEE is following technical support instructions and before any Update is installed, (g) proper use of the BRAINTECH Software, (h) problems caused by changes or modifications to the operating characteristics of the Designated Computer, and (i) problems that occur as a result of the use of the BRAINTECH Software in conjunction with software not supplied by BRAINTECH;

(7)   Affiliates shall not have the right, and LICENSEE shall ensure that affiliates do not, institute any claim directly against BRAINTECH under or related to this Agreement.

In Witness Whereof, the parties hereto have caused this Agreement to be executed by their respective, duly authorized representative on the day and year first above written

Accepted by
BRAINTECH Canada Inc.

Per: _____
Authorized Signature
Name: Owen Jones
Title: CEO
Date: _May 5th, 2006_____

Accepted by
Robot Automation, ABB Inc.

Per: _____
Authorized Signature
Name: _A. Goos_____

Title: _Bu Manager Robot Automation_
Date: _May 19th, 2006_____

38



EXHIBIT 8

RUNTIME SOFTWARE LICENSE AGREEMENT

IMPORTANT - READ CAREFULLY BEFORE INSTALLING OR USING THE BRAINTECH CANADA INC. SOFTWARE on the enclosed disks and/or installed on the computer delivered by BRAINTECH Canada Inc. ("BRAINTECH"). By installing or using the enclosed hardware key and/or BRAINTECH Software and/or files customized by BRAINTECH for the End Users application, the Integrator, as defined in the specific Proposal related to BRAINTECH's supply of the aforementioned hardware and/or software and/or files (herein called the "LICENSEE ') is agreeing with BRAINTECH Canada Inc. ("BRAINTECH") to be bound by the terms of this Software License Agreement including the following Limited Warranty on the System and the Special Provisions.

If you do not agree to the terms of this agreement, promptly return the unopened box with the hardware key and/or BRAINTECH Software and/or files customized by BRAINTECH for the end users application to BRAINTECH for a full refund.

All capitalized terms in this Agreement shall have the meaning provided in the Proposal related to BRAINTECH's supply of the aforementioned hardware and/or software and/or files (herein referred to as the "Proposal"), provided to the LICENSEE by BRAINTECH, unless the context required otherwise.

1. Grant of License. BRAINTECH hereby grants to the LICENSEE a non-exclusive, non-transferable license to: (a) use, in object code form only, the BRAINTECH Software for the purpose of integrating the BRAINTECH Software into the End User Equipment for delivery to the End User; and (b) to grant to the End User, excepting that the End User is also the LICENSEE, a non-exclusive, non-transferable license to use, in object code form only, the BRAINTECH Software with the End User's Equipment solely for the End User's own internal manufacturing process on terms no better than those granted or provided by BRAINTECH to the LICENSEE  herein and subject to the same limitations, restrictions and special provisions with respect to the BRAINTECH Software and the System as those contained herein.

2. Term. This Agreement will be effective from the date of acceptance, and shall continue in effect unless terminated as provided herein.

3. Separate License Required. A separate license is required for each personal computer on which the BRAINTECH Software is installed or used.

4. Reverse Engineering, De-compilation, and Disassembly. The LICENSEE may not reverse engineer, de-compile, or disassemble the BRAINTECH Software or the System, except and only to the extent that



CONFIDENTIAL

such activity is expressly permitted by applicable law notwithstanding this limitation.

5.   Resale or Rental.  Except as expressly permitted herein, the LICENSEE may not sell, rent, lease, or lend the BRAINTECH Software.  Except as expressly permitted herein, the LICENSEE may not assign its rights under this Agreement or sub-license the BRAINTECH Software.

6.   Reservation of Rights.  All rights not expressly granted in respect of the BRAINTECH Software are reserved by BRAINTECH.

In section 7 and 8 of this Agreement, a reference to BRAINTECH means a reference to all affiliates of BRAINTECH including BRAINTECH Inc., any of which may enforce the rights under this agreement.

7.   Copyright.  All title and intellectual property rights, copyright, moral rights, and patent rights in and to the BRAINTECH Software (including but not limited to any images, photographs, animations, video, audio, music, text and "applets" incorporated into the BRAINTECH Software), the Program Documentation, and any copies of the BRAINTECH Software are owned by BRAINTECH or other third parties.  Nothing in this Agreement shall constitute a grant, transfer, or assignment to the LICENSEE of any of the foregoing rights.

8.   Copying Prohibited.  The LICENSEE may not make copies of the BRAINTECH Software or the Program Documentation, except one copy for backup security storage purposes.  The LICENSEE will instruct its employees having access to the BRAINTECH Software not to copy or duplicate the BRAINTECH Software or make any disclosure with reference thereto or any components thereof to any third party.

9.   Confidential Information.   The LICENSEE shall not disclose, and shall keep confidential, all confidential and proprietary information provided by BRAINTECH or any subsidiary or agent of BRAINTECH relating to the BRAINTECH Software.  This provision shall not apply to information which (i) is or becomes part of the public domain through no act or omission of the LICENSEE, (ii) the LICENSEE receives from a third party acting without any obligation or restriction of confidentiality in favor of BRAINTECH,  (iii) BRAINTECH releases from confidential treatment by written consent, or (iv) the LICENSEE is required by any applicable law or court order to disclose.

10. Termination Right.  BRAINTECH may terminate the license granted to the LICENSEE pursuant to this Agreement by notice in writing to the LICENSEE if (i) the LICENSEE commits any material breach of the terms and conditions of this Agreement, and (ii) the LICENSEE fails to rectify its default within thirty, (30) days of receiving written notice from BRAINTECH requiring it to do so.

11. Obligations of LICENSEE on Termination.  Forthwith following termination of the LICENSEE 's license pursuant to section 10, the LICENSEE shall return to BRAINTECH any and all copies of the BRAINTECH



CONFIDENTIAL

Software and the Program Documentation in its possession. LICENSEE shall also delete any electronic copies of the BRAINTECH Software and Program Documentation from any computer equipment of the LICENSEE.

12. Limited Warranty. BRAINTECH warrants that the System will perform to the specifications contained in the Proposal, subject to the limitations and conditions described in the Proposal, for a period of one (1) year from the date of satisfactory installation of the System by BRAINTECH; provided that BRAINTECH gives no warranty that the Hardware, Peripherals and Third Party Software will be free from defects in workmanship or materials, or that they will operate in conformity with the performance capabilities, specifications, functions and other descriptions and standards applicable to the Hardware, Peripherals and the Third Party Software (the "BRAINTECH Limited Warranty"). The foregoing warranty is contingent upon the proper use of the System in accordance with BRAINTECH's instructions, and will be void if the System has been modified without BRAINTECH's approval, or if the System has been subjected to accident, abuse, misapplication, abnormal use, a virus, unusual physical or electrical stress, or if malfunction occurs because of failure of electrical power, air conditioning, humidity control, or causes other than ordinary use, or if the System is maintained or repaired, or if attempts to repair or service are made by other than BRAINTECH personnel without the prior approval of BRAINTECH.

13. The LICENSEE 's Exclusive Remedy. BRAINTECH's entire liability and the LICENSEE 's exclusive remedy shall be, at BRAINTECH's option from time to time, (a) return of the amount received by BRAINTECH in respect of the license granted under this Agreement, or (b) repair or replacement, if the System does not meet the BRAINTECH Limited Warranty. The LICENSEE will receive the remedy elected by BRAINTECH without charge, except that the LICENSEE is responsible for any expenses the LICENSEE may incur in giving BRAINTECH access to the System. Any replacement or repair of the System will be warranted for the remainder of the original warranty period or thirty days, whichever is longer.

14. Disclaimer Of Warranties. The BRAINTECH Limited Warranty is the only express warranty made to the LICENSEE and is provided in lieu of any other express warranties (if any) created by any documentation, packaging, or written or oral representation with respect to the System. Except for the BRAINTECH Limited Warranty and to the maximum extent permitted by applicable law, BRAINTECH provides the System AS IS AND WITH ALL FAULTS, and hereby disclaims all other warranties and conditions, either express, implied or statutory, including but not limited to, any (if any) implied warranties or conditions of merchantability, of fitness for a particular purpose, correspondence to description, of lack of viruses, of accuracy or completeness of responses, of results, and of lack of negligence or lack of workmanlike effort, all with regard to the System.

15. Exclusion Of Incidental, Consequential, And Certain Other Damages.  To the maximum extent



permitted by applicable law, in no event shall BRAINTECH be liable for any special, incidental, indirect, or consequential damages whatsoever (including, but not limited to, damages for loss of profits or confidential or other information, for business interruption, for personal injury, for loss of privacy, for failure to meet any duty including of good faith or of reasonable care, for negligence, and for any other pecuniary or other loss whatsoever) arising out of or in any way related to the use of or inability to use the System or any component thereof, even in the event of the fault, tort (including negligence), strict liability, breach of contract, or breach of warranty of BRAINTECH, and even if BRAINTECH has been advised of the possibility of such damages.

16. Limitation Of Liability And Remedies.  Notwithstanding any damages that the LICENSEE might incur for any reason whatsoever (including without limitation, all damages referenced above and all direct or general damages), the entire liability of BRAINTECH under any provision of this Agreement and the LICENSEE 's exclusive remedy for all of the foregoing (except for any remedy of repair or replacement elected by BRAINTECH with respect to any breach of the BRAINTECH Limited Warranty) shall be limited to the amount received by BRAINTECH in respect of the license granted under this Agreement.  The foregoing limitations, exclusion and disclaimers described above shall apply to the maximum extent permitted by applicable law, even if any remedy fails its essential purpose.



## EXHIBIT 9

### ABB Services

| | | |
|---|---|---|
| I. | Engineering Services | |
| | • Mechanical/Controls Design | US $85.00/Hr. |
| | • Software Engineering | US $100.00/Hr. |
| II. | Project Management | US $120.00/Hr. |
| III. | System Build | US $78.00/Hr. |
| IV. | Field Service Implementation | US $85.00/Hr. |

Plus travel expenses and per diem meals at US $50.00/day.



CONFIDENTIAL

## EXHIBIT 10

Sub-License Agreement

(attach blank ABB sub-license agreement)



**EXHIBIT 11**

GLOBAL MARKET SIC CODES

SIC CODE #                    DESCRIPTION



CONFIDENTIAL

**EXHIBIT 12**

**Bin Picking Project**

A.  Project Description

Placement of objects into containers is a universal theme in virtually every sector of every industry.  Bins and containers are widely utilized to contain, protect and transport every imaginable type of product ranging from auto parts to agricultural produce.  Considerable effort and energy is therefore spent on loading and unloading of objects into and out of bins.

Despite advances in automation technologies the vast majority of bin-picking applications are still performed manually.  This is directly attributable to the fact that the great majority of robotic products available today operate without visual feedback and therefore on the assumption that objects to be processed are always located at a pre-determined and consistent position.  This assumption has severely limited the feasibility of robotic automation application in general and bin picking in particular.

The problem of recognizing a simple industrial part among many lying jumbled in a storage bin, such that a robot is able to grasp and manipulate the part in an industrial process, has received attention for over 30 years. Advances in processing speed, new algorithms, and significant engineering have been combined to solve limited versions of the problem, e.g. for very simple parts, or where there is no occlusion. However solutions capable of handling more challenging cases involving fully or even semi-random bins have not appeared at this point.

Amongst the major issues faced one can count lighting effects causing problems for stereo reconstruction, and specularities that create spurious data both for stereo and laser range finders as well as robust part segmentation i.e., separating each individual part from the background of other jumbled parts or artifacts within the bin.

B.  Prototype Description

The Braintech bin picking project will focus on creating a prototype solution to a singular application as defined by a specific part.  The prototype system is concerned with the ability to remove multiple instances of the given part from a semi-random bin within industrially



CONFIDENTIAL

practical parameters of accuracy, repeatability and speed. A mutually agreed upon part will be chosen for this prototype. If this part is not chosen by May 26, 2006, the prototype part to be used will be a plastic access panel used in the manufacture of consumer goods. The part chosen must present sufficient type and number of features such that its 3D position can be determined using the proven Single Camera 3D (SC3D™) technology currently deployed as a functional package in the eVisionFactory™ software platform.

The approximate sequence of operations expected from said prototype are as follows. After removal from the manufacturing process, the plastic panels are placed into bins roughly 1m x 1m x 1m in heigh, width and length. The panels are stacked on top of one another and form multiple vertical columns within the bin. The columns are randomly oriented and can lean significantly such that the position of the part at the top of the column cannot be known ahead of time to within an acceptable range (e.g., +/- 50mm) typical of organized bins. This means that one cannot instruct the robot to simply go to pre-trained image capture points and expect to see a whole part in an image captured by the robot mounted camera. The bin picking prototype is therefore required to start from a general image capture position and use a robot mounted and/or statically mounted camera to first determine the approximate location of a suitable part candidate. Once this is determined, the robot is to be instructed to move closer to the candidate 3D location. This step is then followed by grasping and removal of the candidate part from the bin.

**Exhibit B**

April 27, 2009

James D. VandeWyngearde, Esq.
Pepper Hamilton LLP
Suite 3600
100 Renaissance Center
Detroit, Michigan  48243-1157

Re:   <u>Escrow for Benefit of ABB Robotics</u>

Dear Mr. VandeWyngearde,

Pursuant to Section 27 of the ***<u>Exclusive Global Channel Partner Agreement for</u>***
***<u>the Licensing of Braintech's Vision Guided Robotics Technologies and Software</u>***
***<u>Products</u>*** dated as of May 5, 2006 ("Licensing Agreement") by and between ABB
and Braintech, we hereby deliver to you a true and complete copy of the Braintech
software executables, source code and documentation ("Escrow") under the
Licensing Agreement.

As you know, at the time the Licensing Agreement was signed, Braintech was
based in Vancouver, British Columbia, Canada, and Braintech's counsel was Clark
Wilson LLP, 800 – 885 West Georgia Street, Vancouver, BC V6C 3H1, Canada.

After moving to Virginia, Braintech deposited the Escrow with Greenberg Traurig
LLP, 1750 Tysons Boulevard, Suite 1200, McLean, Virginia 22102.

Now, in deference to ABB's Detroit area location, Braintech sends you the Escrow
in its most current updated form to your Detroit office at the above address.

Thank you for your assistance in this matter.

Very truly yours,

Thomas E. McCabe
EVP, General Counsel & Secretary

Enclosure (DVD with eVF Source Code, Executables, Documentation)

cc:   Mr. ~~Steve West~~ (ABB) (acknowledged: _TJW_  [initials])
        Tom Watson                                    for Steve West / ABB


**Braintech**  Suite 350 - 1750 Tysons Boulevard McLean, VA 22102 • www.braintech.com

**Exhibit C**

# αββ

February 24, 2009

Mr. Jim Dara
Braintech
1750 Tysons Boulevard
Suite 350
McLean, VA 22102

**Re:  Letter of Commercial Clarifications**

Dear Jim,

This letter is to document and formalize our previous correspondence and discussions regarding the Exclusive Global Channel Partner Agreement for the Licensing of Braintech's Vision Guided Robotics Technologies and Software Products between Braintech Canada, Inc. and ABB Inc. dated May 5, 2006 ("Contract").  As you are aware, our companies have differing opinions as to the meaning of some of the terms in the Contract relating to rights and obligations.  In an effort to settle these existing disputes and to clarify ongoing contractual obligations arising under the Contract relating to the ABB Inventory of Braintech Software Licenses, ABB and Braintech agree as follows:

**1.  ABB Inventory and Future Upgrades of Braintech Software**

a.  For every 2D License of the Braintech Software sold to an end-user customer by ABB, Braintech will provide ABB with a Developer / Integrator License for that end-user customer.  Braintech will also provide ABB with up to forty (40) developer licenses for ABB's internal use only. The forty (40) Developer / Integrator Licenses shall be renewable or remain enabled without license expiration, at no cost to ABB, so long as ABB has an Inventory of Braintech Software.  The Developer / Integrator Licenses will not include the Matrox Image Library License, USB License Key or calibration template.  ABB will exchange its current inventory of Developer / Integrator Licenses and Keys for 3D Licenses and Keys.

b.  On March 30, 2009, Braintech will deliver, at no cost to ABB, a preliminary version of Braintech Software with the improvements necessary to complete the TrueView Lean project.  These improvements will enable the TrueView GUI application, running on the robot teach pendent, to retrieve failed images from the eVF, calibrate the vision system, save calibration data to the eVF, and monitor communication status between the eVF and robot controller.  The improvement actions are further defined in the Project Plan.  Braintech agrees to work in good faith towards the completion of the Project Plan to deliver a stable and defect free version of Braintech Software, at no cost to ABB, to achieve a commercially deployable TrueView Lean product no later than May 1, 2009.

c.  Braintech retains the obligation to maintain a PC application interface and communication protocol between the eVF and IRC 5 robot controller.  Any changes to this interface and communication protocol must be documented and shared with ABB.

d.  Any necessary recompilations of the CEM_ABB_IRC5.exe file will be provided by Braintech, at no cost to ABB, through December 31, 2009.  After December 31,

Jim Dara
February 24, 2009

2009, any necessary recompilations of the CEM_ABB_IRC5.exe file will be provided by Braintech at a cost to ABB not to exceed $5,000.00 USD.

e. Braintech agrees to incorporate the improvements for random bin picking into the Braintech Software. Braintech agrees to work in good faith towards the completion of the Project Plan to deliver a stable and defect free version of Braintech Software to achieve a commercially deployable random bin picking application no later than August 31, 2009. Braintech agrees to deliver these improvements at no cost to ABB.

f. Braintech agrees to continue the development of Braintech Software to provide a commercially successful random bin picking application at no cost to ABB. Braintech agrees to upgrade, at no cost to ABB, the ABB Inventory of Braintech Software Licenses with any improvements, upgrades, and maintenance packages to the random bin picking modules.

g. When completed, Braintech will deliver, at no cost to ABB, a version of Braintech Software that runs on the Microsoft Windows XP Embedded or Vista operating system. Braintech and ABB will meet during the week of March 2 to discuss whether XP Embedded or Vista is preferable. Should the obsolescence of Microsoft Windows XP or Embedded cause the ABB Inventory of Braintech Software to become obsolete, Braintech will deliver, at no cost to ABB, a version of Braintech software that is able to run on the Windows Vista operating system.

h. Braintech will continue to provide ABB with six month demonstration licenses of Braintech Software at no cost to ABB. The demonstration license will be provided to ABB without a Matrox Image Library Key, USB License Key or calibration template.

i. ABB is authorized to reproduce the Braintech Software CD ROM as necessary to globally sell and distribute the TrueView function package.

j. The ABB Inventory of Braintech Software 3D licenses will include SL3D and SR3D modules when available. Braintech will provide ABB with unfinished versions of SL3D and SR3D and ABB will provide Braintech with feedback. If ABB intends to deliver an SL3D or SR3D license to an end-user, Braintech agrees to finish a version of Braintech Software, within ninety (90) days after notification from ABB, to support this functionality.

k. At the time ABB pulls a Braintech Software License from the ABB inventory, ABB may choose which version of Braintech Software will be installed up to and including the newest version of Braintech Software commercially available. If ABB elects to install the newest version of Braintech Software it will be provided at no cost to ABB and will include all improvements, upgrades, software maintenance packages, user documentation manuals, training manuals, and service manuals released by Braintech at that time.

2. **Warranty of ABB Inventory**

a. The Braintech Software warranty, which includes Third Party Software such as the Matrox Image Library, will begin at the time ABB delivers a license from inventory and continue for twelve (12) months thereafter. Delivery is defined as the date upon which ABB the ABB customer accepts delivery of the TrueView function package.

b. In the event that, within the warranty period, the Braintech Software is found to be defective Braintech shall, within thirty (30) days after receipt of the claim, repair or replace the defect.

Jim Dara
February 24, 2009

3. **Exchange of Braintech Software Licenses and Keys**

   a. Braintech agrees that ABB may exchange Braintech Software Licenses, including the Developer / Integrator Licenses, at no additional cost to ABB. The licenses are interchangeable based on the established values. As an example, ABB may exchange fifty-six (56) 2D Licenses for ten (10) 3D Licenses.
   b. For the purpose of inventory exchange ratios, the price level for random bin picking licenses will be set at the price level established for the 3D license.
   c. Braintech will deliver, after pre-payment of $80 per unit from ABB, USB License Keys in exchange for all Serial License Keys in the ABB Inventory.

4. **Delivery of Third Party Software Including Matrox Image Library Licenses**

   a. For Braintech Software licenses in ABB inventory as of the date of this letter, Braintech agrees to deliver Third Party Software, including the MIL License, MIL Key, and calibration template, within ten (10) business days, after ABB notifies Braintech that it has pulled a Braintech Software License Key from the ABB inventory and sold the associated TrueView function package to an end-user, or ABB channel partner customer. For quantities greater than ten (10) units, the time shall be extended to thirty (30) calendar days.
   b. ABB understands that upgrades, updates, improvements and exchanges of the Braintech Software licenses will apply only to ABB's then-remaining inventory of Braintech Software.

5. **Escrow of Executables and Source Code**

   a. Braintech will place in Escrow on or before March 31, 2009, at a mutually agreeable Escrow Agent, the executables, source code and documentation for the Braintech Software.
   b. ABB shall have the right to visit the facilities of Braintech prior to the placement of the Software into Escrow so that ABB and Braintech can (i) verify the Escrow; (ii) place the Escrow in suitable packaging for shipment by a recognized courier service such as Federal Express to the Escrow Agent; and (iii) give possession of the same to the courier service. To that end Braintech shall notify ABB in writing of the expected date of such first delivery no less than ten (10) business days before such expected date and in response thereto ABB shall notify Braintech in writing of the date ABB will visit the facilities of Braintech for the purposes set forth above.

6. **Payment of ABB Purchase Order**

   a. In return for the Braintech deliverables identified above, ABB will deliver payment by wire transfer in immediately available funds to Braintech, Inc. to the account designated by Braintech in an email to Steve West on February 25, 2009, in the amount of US$1,250,000.00 on March 2, 2009, representing the final amount due Braintech under the Contract.

Jim Dara
February 24, 2009

Please indicate your agreement with the above terms by having an authorized
representative of Braintech sign in the space below and return one copy to me at the
address below.

Sincerely,


Steve West
ABB Inc.
1250 Brown Road
Auburn Hills, MI 48326

Jim Dara
February 24, 2009

AGREED TO AND ACKNOWLEDGED BY:

BRAINTECH, INC.

By: _____

Thomas E. McCabe
Executive Vice President

2-27-2009
_____
Date

**Exhibit D**



**EQUIPMENT LOAN AGREEMENT**

This EQUIPMENT LOAN AGREEMENT (the "Agreement") made this <u>1st day of July, 2009</u> (the "Effective Date") is between ABB Inc., with a place of business at 1250 Brown Rd., Auburn Hills, MI 48326 (hereinafter referred to as "ABB") and <u>Braintech, Inc.,</u> with a place of business at <u>2001 Centerpoint Parkway, Suite 103, Pontiac, Michigan 48341</u> (hereinafter referred to as "Company").

ABB hereby agrees to loan to Company, without charge, the equipment identified as an <u>IRB 6600 IRC5 Robot and controller with the serial number of 66-52030 and IRB140 S4C+ robot and controller with the serial number 14-11506</u> (hereinafter referred to as the "Loaned Equipment") for the purpose specified in Section 1 hereof upon the terms and conditions stated herein.

**Section 1.  Purpose.**  This Agreement is entered into <u>so the Company may use to generate further improvement of the eVF software platform by Braintech.</u>

**Section 2.  Term/Scope of Agreement.**  This Agreement shall commence on the Effective Date and shall continue in full force and effect until the Loaned Equipment is returned to ABB <u>on December 31, 2009,</u> unless otherwise agreed upon in writing.  ABB reserves the right to terminate this Agreement without cause on 30 day prior written notice.  ABB may immediately terminate this Agreement without notice if Company breaches any provision of the Agreement, or if Company becomes insolvent or makes an assignment for the benefit of creditors, or if any insolvency proceedings are initiated by or against Company, or if the Loaned Equipment or any part thereof is encumbered, pledged, or attached, seized or taken under any judicial process, and in such an event ABB shall be entitled to immediate possession of the Loaned Equipment at Company's expense.  Company shall return to ABB the Loaned Equipment in the same condition as delivered, reasonable wear and tear excepted

**Section 3.  Transportation/Risk of Loss or Damage.**  Company will arrange for and pay all freight to the site, demurrage, storage, unloading, assembly, disassembly, handling charges and any special packing, crating, documentation, export and tariff papers and customs clearances or other charges against Loaned Equipment incurred during the term of this Agreement.  Company is responsible for damage to or loss of Loaned Equipment during transit to the site, and is responsible for inspecting and inventorying Loaned Equipment, obtaining written acknowledgements from the carrier, and filing claims for any damage loss or shortage occurring during shipment to the site.  Risk of loss shall pass to Company upon shipment by ABB and any damage, loss or shortage which occurs thereafter during the term of this Agreement shall be repaired or replaced at the expense of Company, to the satisfaction of ABB.

**Section 4.  Location.**  The Loaned Equipment will be located at <u>Braintech, Inc.</u> for the term of this Agreement.  The Loaned Equipment shall not be moved from Company's premises (at the address specified below) without the prior written consent of ABB

<u>Attn: Jerry Osborn, (248) 467-4823</u>
<u>2001 Centerpoint Parkway, Suite 103</u>
<u>Pontiac, MI 48341</u>

**Section 5.  Ownership of Equipment.**  Title to the Loaned Equipment shall at all times remain in ABB.

**Section 6.  Warranty.**  This transaction is not a sale of goods. ABB makes no warranty either express or implied to Company or any other person. NO IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE SHALL APPLY. ABB is responsible only for providing Loaned Equipment meeting the description stated herein.

**Section 7.  Support, Installation and Maintenance.**  Company accepts Loaned Equipment "as-is" and agrees ABB has no support, installation or maintenance responsibilities for the Loaned Equipment while on loan to Company.

**Section 8.  Notice.**  Any notice or communication required or permitted hereunder shall be sufficiently given if delivered or mailed by certified mail, postage prepaid, to the following names and addresses:

| | |
|---|---|
| If to Company: | If to ABB: |
| Attn:  *JERRY OSBORN* | Attn: Kinda Bradley |
| *GRAINTECH* | ABB Inc. |
| *2001 CENTERPOINT PKWY, STE. 103* | 1250 Brown Rd. |
| *PONTIAC, MI  48341* | Auburn Hills, MI 48326 |

**Section 9.  Indemnification and Liability.**  Company shall defend, indemnify and hold harmless, ABB, its affiliated companies and their officers, agents and employees from and against all claims, loss, levy, penalties, liability or expense, including legal expenses, incurred by reason of any violation of any rule, regulation or law, or by reason of bodily injury including death or property damage of any character sustained during or arising out of this Agreement by any person or persons, including but not limited to Company's employees, as a result of the maintenance, use, operation, storage, erection, dismantling, servicing or transportation of Loaned Equipment or of any failure on the part of Company to comply with this Agreement.  Company agrees to pay ABB for all loss and damages to Loaned Equipment occasioned by fire, theft, flood, accident, explosion, wreck, act of God or any other cause arising during the term of this Agreement.. ABB is not obligated to undertake the collection of any claim arising during the term of this Agreement.  Loaned Equipment damaged, destroyed, lost or seized from whatever cause, remains on loan without abatement while being repaired, or until returned.  ABB shall not be liable for any loss, delay, or direct, indirect, incidental or consequential damages under this Agreement.  Company guarantees to return Loaned Equipment at the conclusion of the term of this Agreement free and clear of all liens, claims or encumbrances.  The indemnity and limit of liability of this section shall continue in full force and effect notwithstanding the termination of this Agreement.

**Section 10.  Insurance.**  Company agrees, at its expense, to obtain and maintain during the term of this Agreement, adequate insurance to cover any costs relating to this Agreement, with companies acceptable to ABB, for the protection of Company and ABB as their interest may appear in connection with the loan under this Agreement. Upon request of ABB, Company shall furnish ABB with certificates or other documentary evidence satisfactory to ABB, showing that insurance carried by Company in accordance with this Section has been obtained, and the policies shall be endorsed to require the insurer to furnish to ABB and Company ten (10) days written notice prior to the effective date of any insurance cancellation or change.  Company's insurance policies shall name ABB as an additional insured and shall waive subrogation.

**Section 11. Inventions and Information.** Unless otherwise agreed in writing by ABB and Company, all right, title and interest in any inventions, developments, improvements or modifications of or for Loaned Equipment shall remain with ABB. Any design, manufacturing drawings or other information submitted to the Company remains the exclusive property of ABB. Company shall not, without ABB's prior written consent, copy or disclose such information to a third party. Such information shall be used solely for the operation or maintenance of the Loaned Equipment and not for any other purpose, including the duplication thereof in whole or in part.

**Section 12. Self Help.** In the event that Company fails to either (a) remit payment for the Loaned Equipment, if applicable, or (b) return the robot in accordance with the terms of this Agreement, Company hereby grants to ABB a license to enter upon the site and to retake the Loaned Equipment. Company acknowledges and agrees that ABB's exercise of its rights under this section is in addition to, and not in substitute for, any and all other rights, at law or in equity, that ABB may possess with respect to Company's failure to pay for or to return the Loaned Equipment.

**Section 13. Alterations.** Company shall not, without the prior written consent of ABB, alter or modify the Loaned Equipment or affix any accessory, equipment, or device thereto

**Section 14. General Provisions.**

 A. This Agreement shall be governed and construed under the laws of the State of New York but excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and excluding New York law with respect to conflicts of law.

 B. The obligations under this Agreement shall not be assigned or transferred by Company without the written approval of ABB, and any attempted assignment or transfer without such consent shall be void. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective representatives, successors and authorized assigns.

 C. If any provision hereof, partly or completely, shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provision or portion hereof and these terms shall be construed as if such invalid or unenforceable provision or portion thereof had never existed.

 D. Company represents and warrants that the Loaned Equipment and any "direct product" thereof are intended for civil use only and will not be used, directly or indirectly, for the production of chemical or biological weapons or of precursor chemicals for such weapons, or for any direct or indirect nuclear end use. Company agrees not to disclose, use, export or re-export, directly or indirectly, any information provided by ABB or any "direct product" thereof as defined in the Export Control Regulations of the United States Department of Commerce, except in compliance with such Regulations

 E. This Agreement, including the attachments, constitutes the entire agreement between the parties with respect to its subject matter, and supersedes all previous communications, representations, understanding and agreement, either oral or written, between the parties. This Agreement shall be modified only by an instrument in writing and signed by duly authorized representatives of the parties.

 F. The failure of ABB to enforce any provision of this Agreement shall in no way be construed as a waiver of such provision and shall not affect the right of ABB at a later time to enforce each and every such provision.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**ABB INC.**

By: _____

Printed: _____

Title: _____

Date: _____

**BrainTech**

By: ~~F.W.We~~

Printed: F. W. NEIDINGER

Title: CEO

Date: 7-17-09

**ABB INC.**

By: _____

Printed: _____

Title: _____

Date: _____

Gryphon Auction Group - Specialist in the Sale of Commercial Personal Property - Aucti...    Page 1 of 3



HOME   BUY   SELL   AGENCY SALES   MY ACCOUNT   FAQS   ABOUT US   NEWS
CONTACT

**Exhibit E**

JOIN OUR
ONLINE
NEWSLETTER

Sign Up Today! This is
how you can learn about
short notice auctions!

[ Email Address Here ]

[ Join ]

**Live Intellectual Property Auction - Braintech, Inc.**

**Live Bidding Starts 10 AM Monday May 24th 2010**

Welcome to rasmus.com



Details
Directions/Map
Contact
Email Auction
Print
View All Auctions
Photo Galleries [+]
Virtual Tour
ONLINE BIDDING
ONLINE PRE-BIDDING
Documents [+]
Catalogs [+]
Auction Terms
Link
Online Presentation
More Information

**Location:**
1650 Tysons Blvd, 14th Floor, McLean, VA 22102

**Live On-Site Auction**
Started Closing At:: Monday, May 24, 2010 at 10:00 AM EDT
Location: 1650 Tysons Blvd. 14th floor, McLean, VA 22102

**Brief Description:**
By order of the secured creditor, intellectual property of this robotics company will sell
by live auction.



Click image to view larger.

## Details

NOTIFICATION OF PUBLIC SALE OF ASSETS

Notice is hereby given that ROBOTICVISIONTECH LLC, P.O. BOX 1037, GREAT FALLS, VA 22066, will sell at public auction to the highest
qualified bidder on Monday, May 24, 2010 at 10:00 a.m. (EST) at the Law Offices of Pillsbury Winthrop Shaw Pittman LLP, 1650 Tysons Blvd.,
14th Floor, McLean, VA 22102, all the tangible and intangible assets of Braintech, Inc., a Nevada corporation, Braintech Industrial, Inc., a
Delaware corporation, and Braintech Government & Defense, Inc., a Delaware corporation, all with an address of 1750 Tysons Blvd., Suite
350, McLean, VA 22102. The auctioneer shall be R.L. Rasmus Auctioneers, Inc., P.O. Box 30760, Alexandria, Virginia 22310, Firm License
Number: VAAF261, phone number 703-768-9000 ext. 232, fax number 703-783-8320 and e-mail address of inquiry@rasmus.com.

Please Review the following links for additional information:

Patent granted:
Method and apparatus for machine-vision (SR3D) Boca at al., Pub. Date: Feb. 2008
Method and apparatus for single camera 3D vision guided robotics
Pending:

System and Method of Determining Object Pose (SL3D) Boca at al.
System and Method of Three-Dimensional pose Estimation (RBP) Boca at al.
Robotic Systems with User Operable ROBOT control Terminals (Vision Controller) Boca at al.
Methods and Apparatus to Facilitate Operations in Image-Based Systems (RBP) Boca at al.
Method and apparatus for single image 3D vision guided robotics (SC3D Variant) Habibi at al., Pub. Date: Sept. 2, 2004
Method and apparatus for single camera 3D vision guided robotics (SC3D) Habibi at al., Pub. Date: Sept. 2, 2004
SYSTEM AND METHOD OF IDENTIFYING OBJECTS
SYSTEM AND METHOD OF ROBOTICALLY ENGAGING AN OBJECT


Live On-Site Auction Only

Inspect:

Monday, May 24th, 2010, starting at 9:00 am (EDT) at the location of the auction. The Intellectual Property information can also be viewed at the following links:

Patent granted:
Method and apparatus for machine-vision (SR3D) Boca at al., Pub. Date: Feb. 2008
Method and apparatus for single camera 3D vision guided robotics
Pending:
System and Method of Determining Object Pose (SL3D) Boca at al.
System and Method of Three-Dimensional pose Estimation (RBP) Boca at al.
Robotic Systems with User Operable ROBOT control Terminals (Vision Controller) Boca at al.
Methods and Apparatus to Facilitate Operations in Image-Based Systems (RBP) Boca at al.
Method and apparatus for single image 3D vision guided robotics (SC3D Variant) Habibi at al., Pub. Date: Sept. 2, 2004
Method and apparatus for single camera 3D vision guided robotics (SC3D) Habibi at al., Pub. Date: Sept. 2, 2004
SYSTEM AND METHOD OF IDENTIFYING OBJECTS
SYSTEM AND METHOD OF ROBOTICALLY ENGAGING AN OBJECT


Bidder Registration:

You can register as an outcry bidder at the auction on Monday, May 24th, 2010, starting at 9:45 am (EDT) at the location of the auction. When you register, you will be required to deliver a $250,000.00 Earnest Money Deposit in the form of a certified check, money order, or cashier's check payable to RoboticVISIONTech LLC. Personal or business checks will not be accepted. In the case of a winning bid, the Earnest Money Deposit is applicable to the purchase of the property. The Earnest Money Deposit will be returned on the day of the auction if you are not the successful bidder.

Auction:

The auction will commence after the introduction of the Auctioneer. The Auctioneer will then present the minimum bid and subsequent bids will be taken in increments of no less than $50,000.00. The Auctioneer will give fair warning and sell all the property to the highest bidder. The property will be sold together and not separately unless so decided by the foreclosing party. The auction may be postponed from time to time by giving notice by public declaration at the current scheduled location and time for the auction. THE FORECLOSING PARTY RESERVES THE RIGHT TO CREDIT BID AND MAY COMBINE A CREDIT BID WITH CASH. THE FORECLOSING PARTY IS NOT REQUIRED TO POST AN EARNEST MONEY DEPOSIT.

Terms:

As a successful bidder, you will be asked to complete and sign an assignment of rights and bill of sale which will have your name inserted as the buyer and the winning bid inserted as the purchase price. The form of assignment of rights and bill of sale will be made available after Thursday, May 20th, 2010, on the Auctioneer's website. The assignment of rights and bill of sale will provide that the sale is an absolute sale with the property sold "AS IS, WHERE IS." It is understood that an amount not to exceed 8% of the Earnest Money Deposit may be required to be paid by the foreclosing party out of the winning bid amount to a senior secured creditor of the property for purposes of releasing its lien on the property. The removal of the property from the location or an agreed upon location with the successful bidder must be completed by 6 pm (EDT) on Wednesday, May 26th, 2010 (the "Closing"). At or before Closing, you will be required to pay the full winning bid amount in the form of a certified check, money order or cashier's check payable to RoboticVISIONTech LLC. Personal or business checks will not be accepted. If you fail to complete the purchase for which you are the successful bidder at or prior to the Closing, you will forfeit your $250,000 Earnest Money Deposit and lose the right to bid at any subsequent foreclosure sale of the property.

Warranty:

There is no warranty or opinion of any nature relating to title, possession, quiet enjoyment, quality, fitness for particular purposes or the like in this disposition of the collateral.

Liability:

Auctioneer's and foreclosing party's liability shall be limited solely to the return of a bidder's Earnest Money Deposit.



Gryphon Auction Group - Specialist in the Sale of Commercial Personal Property - Aucti...    Page 3 of 3

© Copyright 1999 - 2010 · Gryphon Auction Group · All Rights Reserved
Powered by: AuctionServices.com and NationalAuctionList.com

 **United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Fri Jul 23 03:54:30 EDT 2010*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP |

**Logout** Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*



| **Word Mark** | ABB |
|---|---|
| **Goods and Services** | IC 001. US 001 005 006 010 026 046. G & S: ADHESIVES FOR GENERAL INDUSTRIAL USE; CATALYSTS FOR USE IN INDUSTRY; CHEMICALS FOR USE IN THE MANUFACTURE OF PAINTS |

IC 002. US 006 011 016. G & S: PAINTS FOR METAL AND MACHINE INDUSTRY; LACQUERS IN THE NATURE OF A COATING; VARNISHES; PRESERVATIVES AGAINST RUST AND AGAINST DETERIORATION OF WOOD; COLORANTS FOR METAL AND MACHINE INDUSTRY; MORDANTS FOR USE IN THE METAL AND MACHINE INDUSTRY; NATURAL RESINS FOR USE IN THE MANUFACTURE OF ADHESIVES; METALS IN FOIL AND POWDER FORM FOR PAINTERS, DECORATORS, PRINTERS AND ARTISTS

IC 003. US 001 004 006 050 051 052. G & S: BLEACHING PREPARATIONS FOR LAUNDRY USE; CLEANING, POLISHING, SCOURING AND ABRASIVE PREPARATIONS; SKIN SOAP, PERFUME, ESSENTIAL OILS FOR PERSONAL USE, HAIR LOTIONS AND DENTIFRICES

IC 004. US 001 006 015. G & S: INDUSTRIAL OILS AND GREASES; ALL PURPOSE AND INDUSTRIAL LUBRICANTS; DUST ABSORBING, WETTING AND BINDING COMPOSITIONS; FUEL FOR MOTOR VEHICLES, NAMELY GASOLINE AND DIESEL

IC 006. US 002 012 013 014 023 025 050. G & S: COMMON METALS AND THEIR ALLOYS, NAMELY ALLOYED AND UN-ALLOYED TOOL STEEL AND STAINLESS STEEL, IN THE FORM OF BARS, BLOCKS, PLATES, RINGS, WIRES, STRIPS, TUBES AND CASTINGS; METAL SAFES

IC 007. US 013 019 021 023 031 034 035. G & S: ELECTRIC MOTORS AND ELECTRIC GENERATORS; ELECTRIC CONVERTERS; GAS, STEAM OR HYDRO TURBINES; TURBOCHARGERS FOR INTERNAL COMBUSTION ENGINES; ELECTRICITY GENERATING POWER PLANTS COMPRISING GAS, STEAM, AND HYDRO TURBINES AND ELECTRIC

GENERATORS; INTERNAL COMBUSTION ENGINES, AND ELECTRICITY RECOVERY UNITS; OIL AND GAS GENERATING PLANTS COMPRISING DOWN HOLE DRILLING RIGS; [ NUCLEAR REACTORS AND PARTS FOR NUCLEAR REACTORS; ] AND INDUSTRIAL ROBOTS; HIGH FREQUENCY MOTOR SPINDLES WITH HIGH FREQUENCY CONVERTERS AND POWER SUPPLY UNITS; CONVEYOR BELTS AND CONVEYORS; ELECTRIC AND COMPRESSED AIR PUMPS; HEAVY MACHINES USED IN HOISTING OPERATIONS, NAMELY, CRANES AND HOISTS

IC 008. US 023 028 044. G & S: HAND TOOLS, NAMELY CLAMPS, PLIERS, SCREWDRIVERS, NUT DRIVERS AND ADJUSTABLE WRENCHES; RAZORS; CUTLERY NAMELY KNIVES, FORKS, AND SPOONS

IC 009. US 021 023 026 036 038. G & S: COMPUTERS, MICROPROCESSORS; COMPUTER SOFTWARE PROGRAMS DEALING WITH THE CONTROL OF ELECTRICITY GENERATING POWER PLANTS, INDUSTRIAL PLANTS, BUILDINGS AND NETWORKS FOR THE TRANSPORT OF ELECTRIC ENERGY, GAS AND OIL; ELECTRIC CABLES, ELECTRIC CONDUCTORS, ELECTRIC WIRES; ELECTRICAL TRANSFORMERS; ELECTRICAL SWITCHGEAR, ELECTRICAL CIRCUIT BREAKERS, ELECTRICAL CONTACTS, ELECTRICAL SURGE ARRESTORS; ELECTRIC RELAYS; REACTOR ELECTRIC POWER COMPENSATORS; ELECTRIC CAPACITORS, ELECTRIC REACTORS, ELECTRIC CONVERTERS AND INVERTERS; ELECTRIC SEMICONDUCTOR ELEMENTS; WATER METERS, ELECTRIC USAGE METERS; BUSHINGS, NAMELY, CABLE BUSHINGS FOR USE IN CIRCUIT BREAKERS AND CURRENT TRANSFORMERS; ELECTRICAL MEASURING INSTRUMENTS, NAMELY, TIME CLOCKS, OPERATING TIME METERS, TIMERS FOR RECORDING AND MEASURING ELECTRIC CURRENTS, AMMETERS, VOLT METERS, CONTROL AND PROTECTIVE EQUIPMENT FOR ELECTRICAL NETWORKS, NAMELY VOLTAGE SURGE PROTECTORS, FIRE ALARMS, ANTI-INTRUSION ALARMS, THEFT ALARMS, PERSONAL SECURITY ALARMS, AND EMERGENCY WARNING LAMPS; BATTERIES; SOLAR COLLECTORS; FLOPPY DISCS FOR COMPUTERS; BLANK FLOPPY COMPUTER DISCS; VOLTAGE REGULATORS FOR ELECTRIC POWER; SCIENTIFIC, NAUTICAL, SURVEYING, PHOTOGRAPHIC, CINEMATOGRAPHIC, OPTICAL, WEIGHING, MEASURING, SIGNALING, CHECKING, LIFE-SAVING AND TEACHING APPARATUS AND INSTRUMENTS, NAMELY, PHOTOGRAPHIC CAMERAS, VIDEO CAMERAS, MOTION PICTURE CAMERAS, OPTICAL DISCS AND FILTERS, AUDIO AND VIDEO TAPE PLAYERS, VIDEO DISK PLAYERS AND COMPACT DISC PLAYERS; BLANK FILMS; APPARATUS FOR RECORDING, TRANSMISSION AND REPRODUCTION OF SOUND AND IMAGES, NAMELY, AUDIO AND VIDEO CASSETTE RECORDERS

IC 010. US 026 039 044. G & S: ARTIFICIAL LIMBS, ARTIFICIAL EYES AND ARTIFICIAL TEETH; SURGICAL CUTLERY; SURGICAL, MEDICAL AND DENTAL APPARATUS AND INSTRUMENTS, NAMELY, SCALPELS, CUTLERY, LAMPS, SURGICAL GOWNS; ORTHOPEDIC ARTICLES, NAMELY, SUPPORTS, SPLINTS, JOINT IMPLANTS; AND SUTURES

IC 011. US 013 021 023 031 034. G & S: ELECTROSTATIC PRECIPITATORS AND WET AND DRY FILTERING INSTALLATIONS; UNITS AND INSTALLATIONS FOR REMOVING OR TREATING POLLUTANTS IN AN EXHAUST STREAM; GAS-TO-GAS HEAT EXCHANGE UNITS, AIR PREHEATERS, THERMAL CATALYTIC AND REGENERATIVE OXIDIZING UNITS; ALL OF THE FOREGOING FOR INDUSTRIAL USE IN FACTORIES, PROCESSING PLANTS AND WASTE DISPOSAL FACILITIES AND FOR USE IN THE ELECTRIC GENERATING UTILITIES; INDUSTRIAL PLANTS FOR THE PRODUCTION, DISTILLATION, REFINING AND TREATMENT OF OIL, GAS, PETROLEUM, HYDROCARBON AND CHEMICAL PRODUCTS AND COMPONENT PARTS THEREFOR; ELECTRIC AND GAS STOVES; HEAT PUMPS

IC 012. US 019 021 023 031 035 044. G & S: AUTOMATIC GUIDE VEHICLES; BOATS, AIRPLANES AND AUTOMOBILES; MARINE VEHICLES, NAMELY, RUN-ABOUTS

IC 014. US 002 027 028 050. G & S: ITEMS MADE OF PRECIOUS METAL, NAMELY JEWELRY BOXES, HAT PINS AND FLOWER BOWLS; BADGES OF PRECIOUS METALS

IC 016. US 002 005 022 023 029 037 038 050. G & S: JOURNALS, BOOKS, MANUALS, AND TECHNICAL BULLETINS ALL DEALING WITH THE GENERATION, TRANSMISSION AND DISTRIBUTION OF ELECTRIC ENERGY, AND PRODUCTS, SYSTEMS AND SERVICES FOR

INDUSTRIAL PROCESSES AND BUILDING SYSTEMS

IC 017. US 001 005 012 013 035 050. G & S: RUBBER, GUTTA-PERCHA, GUM, ASBESTOS, AND MICA FOR USE IN THE CONSTRUCTION INDUSTRY, AND AUTOMOBILE INTERIORS; RUBBER, GUTTA-PERCHA, GUM, ASBESTOS, AND MICA IN THE FORM OF PELLETS, SHEETS, RODS, SLABS AND SHAPED PIECES; PLASTIC IN EXTRUDED FORM FOR GENERAL INDUSTRIAL USE; PLASTIC IN EXTRUDED FORM FOR USE IN MANUFACTURE OF SHOES, FURNITURE, PROTECTIVE HELMETS, AUTOMOBILE INTERIORS; PLASTIC AND RUBBER PADDING FOR SHIPPING CONTAINERS; GLASS FIBERS FOR USE IN THE MANUFACTURE OF BUILDING INSULATION

IC 018. US 001 002 003 022 041. G & S: LEATHER AND IMITATION LEATHER SOLD IN BULK, ANIMAL SKINS, TRUNKS AND TRAVELING BAGS; UMBRELLAS, PARASOLS AND WALKING STICKS; BAGS MADE OF LEATHER OR CLOTH, NAMELY, SPORT BAGS, BACKPACKS, HANDBAGS, BAGS WORN AROUND THE WAIST, HAVERSACKS, CLUTCHES, MOUNTAIN CLIMBING BACKPACKS, HIKING BACKPACKS, SKIING BACKPACKS, SHOE BAGS FOR TRAVEL, RUCKSACKS, SCHOOL BAGS, TRAVEL BAGS WITH WHEELS, MONEY HOLDERS IN THE NATURE OF WALLETS SOLD EMPTY, EMPTY TOOL BAGS, GARMENT BAGS FOR TRAVELING, AND LEATHER STRAPS, EMPTY PURSES NOT OF PRECIOUS MATERIAL; WHIPS AND SADDLERY

IC 019. US 001 012 033 050. G & S: BUILDING MATERIALS, NAMELY WALL, HARDWOOD, DECKING, WOOD PARTICLE; BOARDS; ASPHALT

IC 020. US 002 013 022 025 032 050. G & S: FURNITURE, NAMELY, TABLES, CHAIRS, SOFAS, ARMCHAIRS, BASES FOR SOFA BEDS, FURNITURE MIRRORS, PICTURE FRAMES IN METAL, WOOD, CORK, REED, CANE, WICKER, HORN, BONE, IVORY, WHALEBONE, SHELL, AMBER, MOTHER-OF-PEARL, MEERSCHAUM AND PLASTICS AND FITTINGS AND PARTS THEREFOR

IC 021. US 002 013 023 029 030 033 040 050. G & S: COOKING UTENSILS, NAMELY, GRILLS; HOUSEHOLD UTENSILS, NAMELY, GRATERS, SIEVES, SPATULAS, STRAINERS AND TURNERS, STEEL WOOL FOR CLEANING; BEVERAGE GLASSWARE; FIGURES MADE OF CHINA, CRYSTAL, EARTHENWARE, GLASS, PORCELAIN, TERRA COTTA; PORCELAIN OR EARTHENWARE DOORKNOBS; CAKE AND FOOD DECORATING BAGS, TUBES AND COUPLERS THERFOR

IC 025. US 022 039. G & S: CLOTHING, NAMELY, FOOTWEAR AND HEAD WEAR

IC 026. US 037 039 040 042 050. G & S: LACE TRIMMING AND EMBROIDERY; RIBBONS AND BRAID; SHIRT BUTTONS, HOOKS AND EYES, SAFETY AND ORNAMENTAL NOVELTY PINS; NEEDLES; ARTIFICIAL FLOWERS

IC 035. US 100 101 102. G & S: DISSEMINATION OF ADVERTISING MATTER; ADVERTISING AGENCIES, NAMELY, PROMOTING THE SERVICES OF TECHNOLOGY AND INDUSTRY THROUGH THE DISTRIBUTION OF PRINTED AND AUDIO PROMOTIONAL MATERIALS AND BY RENDERING SALE PROMOTION ADVICE; BUSINESS INFORMATION MANAGEMENT IN THE FIELD OF TECHNOLOGY AND INDUSTRY; BUSINESS CONSULTATION; PUBLIC OPINION POLLING; ORGANIZING EXHIBITIONS FOR COMMERCIAL PURPOSE; CONDUCTING BUSINESS RESEARCH AND SURVEYS; EXPORT AND IMPORT AGENCIES; INSURANCE CLAIMS AUDITING SERVICES

IC 036. US 100 101 102. G & S: BROKERAGE IN THE FIELD OF FINANCIAL AFFAIRS, INSURANCE, STOCKS, COMMODITIES, INVESTMENT; ACCIDENT INSURANCE UNDERWRITING; FINANCIAL ANALYSIS AND CONSULTATION

IC 037. US 100 103 106. G & S: BUILDING CONSTRUCTION AND REPAIR; INSTALLATION OF COMPUTER NETWORKS AND COMPUTER SYSTEMS; MACHINERY MAINTENANCE AND REPAIR

IC 038. US 100 101 104. G & S: PROVIDING TELECOMMUNICATIONS CONNECTIONS TO A

GLOBAL COMPUTER NETWORK; TELECOMMUNICATION SERVICES, NAMELY, LOCAL AND LONG DISTANCE TRANSMISSION OF VOICE, DATA, GRAPHICS BY MEANS OF TELEPHONE, TELEGRAPHIC, CABLE, AND SATELLITE TRANSMISSIONS; ELECTRONIC MESSAGING SYSTEM, NAMELY, ELECTRONIC QUEUING SERVICES

IC 039. US 100 105. G & S: TRANSPORT BY FERRY, BOAT, RAIL, AIR, CAR AND LORRY; FREIGHT FORWARDING; STORAGE OF COMMERCIAL AND INDUSTRIAL GOODS

IC 040. US 100 103 106. G & S: FUEL TREATMENT SERVICES; METAL TREATMENT; RECYCLING; WASTE TREATMENT; FUEL REFINING; LEASING OF ENERGY GENERATING EQUIPMENT

IC 041. US 100 101 107. G & S: EDUCATION IN THE FIELD OF COMPUTERS, ENGINEERING, TECHNOLOGY AND INDUSTRY; CONDUCTING WORKSHOPS AND SEMINARS IN THE FIELD OF COMPUTERS, ENGINEERING, TECHNOLOGY AND INDUSTRY; EDUCATIONAL SERVICES NAMELY CONDUCTING CLASSES, SEMINARS, CONFERENCES AND WORKSHOPS IN THE FIELD OF COMPUTERS, ENGINEERING, TECHNOLOGY AND INDUSTRY; ORGANIZING EXHIBITIONS FOR EDUCATIONAL, CULTURAL, SPORTING AND ENTERTAINMENT PURPOSE

IC 042. US 100 101. G & S: ENGINEERING; TECHNICAL CONSULTATION AND RESEARCH IN THE FIELD OF ENGINEERING; LEASING OF COMPUTERS AND COMPUTER FACILITIES; CONSULTING SERVICES IN THE FIELD OF DESIGN, SELECTION, IMPLEMENTATION AND USE OF COMPUTER HARDWARE AND SOFTWARE SYSTEMS FOR OTHERS; LEGAL SERVICES

| | |
|---|---|
| Mark Drawing Code | (5) WORDS, LETTERS, AND/OR NUMBERS IN STYLIZED FORM |
| Serial Number | 76385320 |
| Filing Date | March 18, 2002 |
| Current Filing Basis | 44E |
| Original Filing Basis | 1B;44D |
| Published for Opposition | September 2, 2003 |
| Change In Registration | CHANGE IN REGISTRATION HAS OCCURRED |
| Registration Number | 2785548 |
| Registration Date | November 25, 2003 |
| Owner | (REGISTRANT) ABB Asea Brown Boveri Ltd CORPORATION SWITZERLAND Affolternstrasse 44 CH-8050 Zurich SWITZERLAND |
| Attorney of Record | B. Brett Heavner, Esq. |
| Priority Date | October 5, 2001 |
| Prior Registrations | 1674702;1695820;1866114;2268027;AND OTHERS |
| Description of Mark | The mark is comprised of the stylized letters "ABB" in red with white lines intersecting each letter vertically and horizontally. |
| Type of Mark | TRADEMARK. SERVICE MARK |
| Register | PRINCIPAL |
| Live/Dead Indicator | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP |

Trademark Electronic Search System (TESS)                                    Page 5 of 5

---

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

 **United States Patent and Trademark Office**

Home|Site Index|Search|FAQ|Glossary|Guides|Contacts|eBusiness|eBiz alerts|News|Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Fri Jul 23 03:54:30 EDT 2010*

**TESS HOME**  **NEW USER**  **STRUCTURED**  **FREE FORM**  **Browser Dict**  **SEARCH OG**  **BOTTOM**  **HELP**

**Logout** Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

**TARR Status**  **ASSIGN Status**  **TDR**  **TTAB Status**  *( Use the "Back" button of the Internet Browser to return to TESS)*

### Typed Drawing

| | |
|---|---|
| **Word Mark** | ABB |
| **Goods and Services** | IC 001. US 001 005 006 010 026 046. G & S: ADHESIVES FOR GENERAL INDUSTRIAL USE; CATALYSTS FOR USE IN INDUSTRY; CHEMICALS FOR USE IN THE MANUFACTURE OF PAINTS |

IC 002. US 006 011 016. G & S: PAINTS FOR METAL AND MACHINE INDUSTRY; LACQUERS IN THE NATURE OF A COATING; VARNISHES; PRESERVATIVES AGAINST RUST AND AGAINST DETERIORATION OF WOOD; COLORANTS FOR METAL AND MACHINE INDUSTRY; MORDANTS FOR USE IN THE METAL AND MACHINE INDUSTRY; NATURAL RESINS FOR USE IN THE MANUFACTURE OF ADHESIVES; METALS IN FOIL AND POWDER FORM FOR PAINTERS, DECORATORS, PRINTERS AND ARTISTS

IC 003. US 001 004 006 050 051 052. G & S: BLEACHING PREPARATIONS FOR LAUNDRY USE; CLEANING, POLISHING, SCOURING AND ABRASIVE PREPARATIONS; SKIN SOAP, PERFUME, ESSENTIAL OILS FOR PERSONAL USE, HAIR LOTIONS AND DENTIFRICES

IC 004. US 001 006 015. G & S: INDUSTRIAL OILS AND GREASES; ALL PURPOSE AND INDUSTRIAL LUBRICANTS; DUST ABSORBING, WETTING AND BINDING COMPOSITIONS; FUEL FOR MOTOR VEHICLES, NAMELY GASOLINE AND DIESEL

IC 006. US 002 012 013 014 023 025 050. G & S: COMMON METALS AND THEIR ALLOYS, NAMELY ALLOYED AND UN-ALLOYED TOOL STEEL AND STAINLESS STEEL, IN THE FORM OF BARS, BLOCKS, PLATES, RINGS, WIRES, STRIPS, TUBES AND CASTINGS; METAL SAFES

IC 007. US 013 019 021 023 031 034 035. G & S: ELECTRIC MOTORS AND ELECTRIC GENERATORS; ELECTRIC CONVERTERS; GAS, STEAM OR HYDRO TURBINES; TURBOCHARGERS FOR INTERNAL COMBUSTION ENGINES; ELECTRICITY GENERATING POWER PLANTS COMPRISING GAS, STEAM, AND HYDRO TURBINES AND ELECTRIC GENERATORS; INTERNAL COMBUSTION ENGINES, AND ELECTRICITY RECOVERY UNITS; OIL AND GAS GENERATING PLANTS COMPRISING DOWN HOLE DRILLING RIGS; [ NUCLEAR REACTORS AND PARTS FOR NUCLEAR REACTORS; ] AND INDUSTRIAL ROBOTS; HIGH FREQUENCY MOTOR SPINDLES WITH HIGH FREQUENCY ELECTRIC CONVERTORS AND POWER SUPPLY UNITS; CONVEYOR BELTS AND CONVEYORS; ELECTRIC AND COMPRESSED AIR PUMPS; HEAVY MACHINES USED IN HOISTING OPERATIONS, NAMELY,

CRANES AND HOISTS

IC 008. US 023 028 044. G & S: HAND TOOLS, NAMELY CLAMPS, PLIERS, SCREWDRIVERS, NUT DRIVERS AND ADJUSTABLE WRENCHES; RAZORS; CUTLERY NAMELY KNIVES, FORKS AND SPOONS

IC 009. US 021 023 026 036 038. G & S: COMPUTERS, MICROPROCESSORS; COMPUTER SOFTWARE PROGRAMS DEALING WITH THE CONTROL OF ELECTRICITY GENERATING POWER PLANTS, INDUSTRIAL PLANTS, BUILDINGS AND NETWORKS FOR THE TRANSPORT OF ELECTRIC ENERGY, GAS AND OIL; ELECTRIC CABLES, ELECTRIC CONDUCTORS, ELECTRIC WIRES; ELECTRICAL TRANSFORMERS; ELECTRICAL SWITCHGEAR, ELECTRICAL CIRCUIT BREAKERS, ELECTRICAL CONTACTS, ELECTRICAL SURGE ARRESTORS; ELECTRIC RELAYS; REACTOR ELECTRIC POWER COMPENSATORS; ELECTRIC CAPACITORS, ELECTRIC REACTORS, ELECTRIC CONVERTERS AND INVERTERS; ELECTRIC SEMICONDUCTOR ELEMENTS; WATER METERS, ELECTRIC USAGE METERS; BUSHINGS, NAMELY, CABLE BUSHINGS FOR USE IN CIRCUIT BREAKERS AND CURRENT TRANSFORMERS; ELECTRICAL MEASURING INSTRUMENTS, NAMELY, TIME CLOCKS, OPERATING TIME METERS, TIMERS FOR RECORDING AND MEASURING ELECTRIC CURRENTS, AMMETERS, VOLT METERS, CONTROL AND PROTECTIVE EQUIPMENT FOR ELECTRICAL NETWORKS, NAMELY VOLTAGE SURGE PROTECTORS, FIRE ALARMS, ANTI-INTRUSION ALARMS, THEFT ALARMS, PERSONAL SECURITY ALARMS, AND EMERGENCY WARNING LAMPS; BATTERIES; SOLAR COLLECTORS; FLOPPY DISCS FOR COMPUTERS; BLANK FLOPPY COMPUTER DISCS; VOLTAGE REGULATORS FOR ELECTRIC POWER; SCIENTIFIC, NAUTICAL, SURVEYING, PHOTOGRAPHIC, CINEMATOGRAPHIC, OPTICAL, WEIGHING, MEASURING, SIGNALING, CHECKING, LIFE-SAVING AND TEACHING APPARATUS AND INSTRUMENTS, NAMELY, PHOTOGRAPHIC CAMERAS, VIDEO CAMERAS, MOTION PICTURE CAMERAS, OPTICAL DISCS AND FILTERS, AUDIO AND VIDEO TAPE PLAYERS, VIDEO DISK PLAYERS AND COMPACT DISC PLAYERS; BLANK FILMS; APPARATUS FOR RECORDING, TRANSMISSION AND REPRODUCTION OF SOUND AND IMAGES, NAMELY, AUDIO AND VIDEO CASSETTE RECORDERS

IC 010. US 026 039 044. G & S: ARTIFICIAL LIMBS, ARTIFICIAL EYES AND ARTIFICIAL TEETH; SURGICAL CUTLERY; SURGICAL, MEDICAL AND DENTAL APPARATUS AND INSTRUMENTS, NAMELY, SCALPELS, CUTLERY, LAMPS, SURGICAL GOWNS; ORTHOPEDIC ARTICLES, NAMELY, SUPPORTS, SPLINTS, JOINT IMPLANTS; AND SUTURES

IC 011. US 013 021 023 031 034. G & S: ELECTROSTATIC PRECIPITATORS AND WET AND DRY FILTERING INSTALLATIONS; UNITS AND INSTALLATIONS FOR REMOVING OR TREATING POLLUTANTS IN AN EXHAUST STREAM; GAS-TO-GAS HEAT EXCHANGE UNITS, AIR PREHEATERS, THERMAL CATALYTIC AND REGENERATIVE OXIDIZING UNITS; ALL OF THE FOREGOING FOR INDUSTRIAL USE IN FACTORIES, PROCESSING PLANTS AND WASTE DISPOSAL FACILITIES AND FOR USE IN THE ELECTRIC GENERATING UTILITIES; INDUSTRIAL PLANTS FOR THE PRODUCTION, DISTILLATION, REFINING AND TREATMENT OF OIL, GAS, PETROLEUM, HYDROCARBON AND CHEMICAL PRODUCTS AND COMPONENT PARTS THEREFOR; ELECTRIC AND GAS STOVES; HEAT PUMPS

IC 012. US 019 021 023 031 035 044. G & S: AUTOMATIC GUIDED VEHICLES; BOATS, AIRPLANES AND AUTOMOBILES; MARINE VEHICLES, NAMELY, RUN-ABOUTS

IC 014. US 002 027 028 050. G & S: ITEMS MADE OF PRECIOUS METAL, NAMELY JEWELRY BOXES, HAT PINS AND FLOWER BOWLS; BADGES OF PRECIOUS OF METALS

IC 016. US 002 005 022 023 029 037 038 050. G & S: JOURNALS, BOOKS, MANUALS, AND TECHNICAL BULLETINS ALL DEALING WITH THE GENERATION, TRANSMISSION AND DISTRIBUTION OF ELECTRIC ENERGY, AND PRODUCTS, SYSTEMS AND SERVICES FOR INDUSTRIAL PROCESSES AND BUILDING SYSTEMS

IC 017. US 001 005 012 013 035 050. G & S: RUBBER, GUTTA-PERCHA, GUM, ASBESTOS, AND MICA FOR USE IN THE CONSTRUCTION INDUSTRY, AND AUTOMOBILE INTERIORS; RUBBER, GUTTA-PERCHA, GUM, ASBESTOS, AND MICA IN THE FORM OF PELLETS, SHEETS, RODS,

SLABS AND SHAPED PIECES; PLASTIC IN EXTRUDED FORM FOR GENERAL INDUSTRIAL USE; PLASTIC IN EXTRUDED FORM FOR USE IN MANUFACTURE OF SHOES, FURNITURE, PROTECTIVE HELMETS, AUTOMOBILE INTERIORS; PLASTIC AND RUBBER PADDING FOR SHIPPING CONTAINERS; GLASS FIBERS FOR USE IN THE MANUFACTURE OF BUILDING INSULATION

IC 018. US 001 002 003 022 041. G & S: LEATHER AND IMITATION LEATHER SOLD IN BULK, ANIMAL SKINS, TRUNKS AND TRAVELING BAGS; UMBRELLAS, PARASOLS AND WALKING STICKS; BAGS MADE OF LEATHER OR CLOTH, NAMELY, SPORT BAGS, BACKPACKS, HANDBAGS, BAGS WORN AROUND AND WAIST, HAVERSACKS, CLUTCHES, MOUNTAIN CLIMBING BACKPACKS, HIKING BACKPACKS, SKIING BACKPACKS, SHOES BAGS FOR TRAVEL, RUCKSACKS, SCHOOL BAGS, TRAVEL BAGS WITH WHEELS, MONEY HOLDERS IN THE NATURE OF WALLETS SOLD EMPTY, EMPTY TOOLS BAGS, GARMENTS BAGS FOR TRAVELING, AND LEATHER STRAPS, EMPTY PURSES NOT OF PRECIOUS MATERIAL; WHIPS AND SADDLERY

IC 019. US 001 012 033 050. G & S: BUILDING MATERIALS, NAMELY WALL, HARDWOOD, DECKING, WOOD PARTICLES; BOARDS; ASPHALT

IC 020. US 002 013 022 025 032 050. G & S: FURNITURE, NAMELY, TABLES, CHAIRS, SOFAS, ARMCHAIRS, BASES FOR SOFA BEDS, FURNITURE MIRRORS, PICTURE FRAMES IN METAL, WOOD, CORK, REED, CANE, WICKER, HORN, BONE, IVORY, WHALEBONE, SHELL, AMBER, MOTHER-OF-PEARL, MEERSCHAUM AND PLASTICS AND FITTINGS AND PARTS THEREFOR

IC 021. US 002 013 023 029 030 033 040 050. G & S: COOKING UTENSILS, NAMELY, GRILLS; HOUSEHOLD UTENSILS, NAMELY, GRATERS, SIEVES, SPATULAS, STRAINERS AND TURNERS, STEEL WOOL FOR CLEANING; BEVERAGE GLASSWARE; FIGURES MADE OF CHINA, CRYSTAL, EARTHENWARE, GLASS, PORCELAIN, TERRA COTTA; PORCELAIN OR EARTHENWARE DOORKNOBS; CAKE AND FOOD DECORATING BAGS, TUBES AND COUPLERS THEREFOR

IC 025. US 022 039. G & S: CLOTHING, NAMELY, FOOTWEAR AND HEADWEAR

IC 026. US 037 039 040 042 050. G & S: LACE TRIMMING AND EMBROIDERY; RIBBONS AND BRAID; SHIRT BUTTONS, HOOKS AND EYES, SAFETY AND ORNAMENTAL NOVELTY PINS; NEEDLES; ARTIFICIAL FLOWERS

IC 035. US 100 101 102. G & S: DISSEMINATION OF ADVERTISING MATTER; ADVERTISING AGENCIES, NAMELY, PROMOTING THE SERVICES OF TECHNOLOGY AND INDUSTRY THROUGH THE DISTRIBUTION OF PRINTED AND AUDIO PROMOTIONAL MATERIALS AND BY RENDERING SALES PROMOTION ADVICE; BUSINESS INFORMATION MANAGEMENT IN THE FIELD OF TECHNOLOGY AND INDUSTRY; BUSINESS CONSULTATION; PUBLIC OPINION POLLING; ORGANIZING EXHIBITIONS FOR COMMERCIAL PURPOSE; CONDUCTING BUSINESS RESEARCH AND SURVEYS; EXPORT AND IMPORT AGENCIES; INSURANCE CLAIMS AUDITING SERVICES

IC 036. US 100 101 102. G & S: BROKERAGE IN THE FIELD OF FINANCIAL AFFAIRS, INSURANCE, STOCKS, COMMODITIES, INVESTMENT; ACCIDENT INSURANCE UNDERWRITING; FINANCIAL ANALYSIS AND CONSULTATION

IC 037. US 100 103 106. G & S: BUILDING CONSTRUCTION AND REPAIR; INSTALLATION OF COMPUTER NETWORKS AND COMPUTER SYSTEMS; MACHINERY MAINTENANCE AND REPAIR

IC 038. US 100 101 104. G & S: PROVIDING TELECOMMUNICATIONS CONNECTIONS TO A GLOBAL COMPUTER NETWORK; TELECOMMUNICATION SERVICES, NAMELY, LOCAL AND LONG DISTANCE TRANSMISSION OF VOICE, DATA, GRAPHICS BY MEANS OF TELEPHONE, TELEGRAPHIC, CABLE, AND SATELLITE TRANSMISSIONS; ELECTRONIC MESSAGING SYSTEM, NAMELY, ELECTRONIC QUEUING SERVICES

IC 039. US 100 105. G & S: TRANSPORT BY FERRY, BOAT, RAIL, AIR, CAR AND LORRY; FREIGHT FORWARDING; STORAGE OF COMMERCIAL AND INDUSTRIAL GOODS

IC 040. US 100 103 106. G & S: FUEL TREATMENT SERVICES; METAL TREATMENT; RECYCLING; WASTE TREATMENT; FUEL REFINING; LEASING OF ENERGY GENERATING EQUIPMENT

IC 041. US 100 101 107. G & S: Conducting workshops and seminars in the field of computer, engineering, technology and industry; educational services namely conducting classes, seminars, conferences and workshops in the field of computers, engineering, technology and industry; organizing exhibitions for educational, cultural, sporting and entertainment purpose

IC 042. US 100 101. G & S: ENGINEERING; TECHNICAL CONSULTATION AND RESEARCH IN THE FIELD OF ENGINEERING; LEASING OF COMPUTERS AND COMPUTER FACILITIES; CONSULTING SERVICES IN THE FIELD OF DESIGN, SELECTION, IMPLEMENTATION AND USE OF COMPUTER HARDWARE AND SOFTWARE SYSTEMS FOR OTHERS; LEGAL SERVICES

| | |
|---|---|
| Mark Drawing Code | (1) TYPED DRAWING |
| Serial Number | 76385322 |
| Filing Date | March 18, 2002 |
| Current Filing Basis | 44E |
| Original Filing Basis | 1B;44D |
| Published for Opposition | November 11, 2003 |
| Change In Registration | CHANGE IN REGISTRATION HAS OCCURRED |
| Registration Number | 2809801 |
| Registration Date | February 3, 2004 |
| Owner | (REGISTRANT) ABB Asea Brown Boveri Ltd CORPORATION SWITZERLAND Affolternstrasse 44 CH-8050 Zurich SWITZERLAND |
| Attorney of Record | Adrienne L. White, Esquire |
| Priority Date | October 5, 2001 |
| Prior Registrations | 1674702;1695820;1866114;2268027;AND OTHERS |
| Type of Mark | TRADEMARK. SERVICE MARK |
| Register | PRINCIPAL |
| Live/Dead Indicator | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP |

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

 **United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Fri Jul 23 03:54:30 EDT 2010*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP |

**Logout** Please logout when you are done to release system resources allocated for you.

## Record 1 out of 1

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | ABB |
| **Goods and Services** | IC 001. US 001 005 006 010 026 046. G & S: ADHESIVES FOR GENERAL INDUSTRIAL USE; CATALYSTS FOR USE IN INDUSTRY; CHEMICALS FOR USE IN THE MANUFACTURE OF PAINTS |
| | IC 002. US 006 011 016. G & S: PAINTS FOR METAL AND MACHINE INDUSTRY; LACQUERS IN THE NATURE OF A COATING; VARNISHES; PRESERVATIVES AGAINST RUST AND AGAINST DETERIORATION OF WOOD; COLORANTS FOR METAL AND MACHINE INDUSTRY; MORDANTS FOR USE IN THE METAL AND MACHINE INDUSTRY; NATURAL RESINS FOR USE IN THE MANUFACTURE OF ADHESIVES; METALS IN FOIL AND POWDER FORM FOR PAINTERS, DECORATORS, PRINTERS AND ARTISTS |
| | IC 003. US 001 004 006 050 051 052. G & S: BLEACHING PREPARATIONS FOR LAUNDRY USE; CLEANING, POLISHING, SCOURING AND ABRASIVE PREPARATIONS; SKIN SOAP, PERFUME, ESSENTIAL OILS FOR PERSONAL USE, HAIR LOTIONS AND DENTIFRICES |
| | IC 004. US 001 006 015. G & S: INDUSTRIAL OILS AND GREASES; ALL PURPOSE AND INDUSTRIAL LUBRICANTS; DUST ABSORBING, WETTING AND BINDING COMPOSITIONS; FUEL FOR MOTOR VEHICLES, NAMELY GASOLINE AND DIESEL |
| | IC 006. US 002 012 013 014 023 025 050. G & S: COMMON METALS AND THEIR ALLOYS, NAMELY ALLOYED AND UN-ALLOYED TOOL STEEL AND STAINLESS STEEL, IN THE FORM OF BARS, BLOCKS, PLATES, RINGS, WIRES, STRIPS, TUBES AND CASTINGS; METAL SAFES |
| | IC 007. US 013 019 021 023 031 034 035. G & S: ELECTRIC MOTORS AND ELECTRIC GENERATORS; ELECTRIC CONVERTERS; GAS, STEAM OR HYDRO TURBINES; TURBO CHARGERS FOR INTERNAL COMBUSTION ENGINES; ELECTRICITY GENERATING POWER PLANTS COMPRISING GAS, STEAM, AND HYDRO TURBINES AND ELECTRIC GENERATORS; |

INTERNAL COMBUSTION ENGINES, AND ELECTRICITY RECOVERY UNITS; OIL AND GAS GENERATING PLANTS COMPRISING DOWN HOLE DRILLING RIGS; AND INDUSTRIAL ROBOTS; HIGH FREQUENCY MOTOR SPINDLES WITH HIGH FREQUENCY ELECTRIC CONVERTERS AND POWER SUPPLY UNITS; CONVEYOR BELTS AND CONVEYORS; ELECTRIC AND COMPRESSED AIR PUMPS; HEAVY MACHINES USED IN HOISTING OPERATIONS, NAMELY, CRANES AND HOISTS

IC 008. US 023 028 044. G & S: HAND TOOLS, NAMELY CLAMPS, PLIERS, SCREWDRIVERS, NUT DRIVERS AND ADJUSTABLE WRENCHES; RAZORS; CUTLERY NAMELY KNIVES, FORKS AND SPOONS

IC 009. US 021 023 026 036 038. G & S: COMPUTERS, MICROPROCESSORS; COMPUTER SOFTWARE PROGRAMS DEALING WITH THE CONTROL OF ELECTRICITY GENERATING POWER PLANTS, INDUSTRIAL PLANTS, BUILDINGS AND NETWORKS FOR THE TRANSPORT OF ELECTRIC ENERGY, GAS AND OIL; ELECTRIC CABLES, ELECTRIC CONDUCTORS, ELECTRIC WIRES; ELECTRICAL TRANSFORMERS; ELECTRICAL SWITCH GEAR, ELECTRICAL CIRCUIT BREAKERS, ELECTRICAL CONTACTS, ELECTRICAL SURGE ARRESTORS; ELECTRIC RELAYS; REACTOR ELECTRIC POWER COMPENSATORS; ELECTRIC CAPACITORS, ELECTRIC REACTORS, ELECTRIC CONVERTERS AND INVERTERS; ELECTRIC SEMICONDUCTOR ELEMENTS; WATER METERS, ELECTRIC USAGE METERS; BUSHINGS, NAMELY, CABLE BUSHINGS FOR USE IN CIRCUIT BREAKERS AND CURRENT TRANSFORMERS; ELECTRICAL MEASURING INSTRUMENTS, NAMELY, TIME CLOCKS, OPERATING TIME METERS, TIMERS FOR RECORDING AND MEASURING ELECTRIC CURRENTS, AMMETERS, VOLT METERS, CONTROL AND PROTECTIVE EQUIPMENT FOR ELECTRICAL NETWORKS, NAMELY VOLTAGE SURGE PROTECTORS, FIRE ALARMS, ANTI-INTRUSION ALARMS, THEFT ALARMS, PERSONAL SECURITY ALARMS, AND EMERGENCY WARNING LAMPS; BATTERIES; SOLAR COLLECTORS; FLOPPY DISCS FOR COMPUTERS; BLANK FLOPPY COMPUTER DISCS; VOLTAGE REGULATORS FOR ELECTRIC POWER; SCIENTIFIC, NAUTICAL, SURVEYING, PHOTOGRAPHIC, CINEMATOGRAPHIC, OPTICAL, WEIGHING, MEASURING, SIGNALING, CHECKING, LIFE-SAVING AND TEACHING APPARATUS AND INSTRUMENTS, NAMELY, PHOTOGRAPHIC CAMERAS, VIDEO CAMERAS, MOTION PICTURE CAMERAS, OPTICAL DISCS AND FILTERS, AUDIO AND VIDEO TAPE PLAYERS, VIDEO DISK PLAYERS AND COMPACT DISC PLAYERS; BLANK FILMS; APPARATUS FOR RECORDING, TRANSMISSION AND REPRODUCTION OF SOUND AND IMAGES, NAMELY, AUDIO AND VIDEO CASSETTE RECORDERS

IC 010. US 026 039 044. G & S: ARTIFICIAL LIMBS, ARTIFICIAL EYES AND ARTIFICIAL TEETH; SURGICAL CUTLERY; SURGICAL, MEDICAL AND DENTAL APPARATUS AND INSTRUMENTS, NAMELY, SCALPELS, CUTLERY, LAMPS, SURGICAL GOWNS; ORTHOPEDIC ARTICLES, NAMELY, SUPPORTS, SPLINTS, JOINT IMPLANTS; AND SUTURES

IC 011. US 013 021 023 031 034. G & S: ELECTROSTATIC PRECIPITATORS AND WET AND DRY FILTERING INSTALLATIONS; UNITS AND INSTALLATIONS FOR REMOVING OR TREATING POLLUTANTS IN AN EXHAUST STREAM; GAS-TO-GAS HEAT EXCHANGE UNITS, AIR PREHEATERS, THERMAL CATALYTIC AND REGENERATIVE OXIDIZING UNITS; ALL OF THE FOREGOING FOR INDUSTRIAL USE IN FACTORIES, PROCESSING PLANTS AND WASTE DISPOSAL FACILITIES AND FOR USE IN THE ELECTRIC GENERATING UTILITIES; INDUSTRIAL PLANTS FOR THE PRODUCTION, DISTILLATION, REFINING AND TREATMENT OF OIL, GAS, PETROLEUM, HYDROCARBON AND CHEMICAL PRODUCTS AND COMPONENT PARTS THEREFOR; ELECTRIC AND GAS STOVES; HEAT PUMPS

IC 012. US 019 021 023 031 035 044. G & S: AUTOMATIC GUIDED VEHICLES; BOATS, AIRPLANES AND AUTOMOBILES; MARINE VEHICLES, NAMELY, RUN-ABOUTS

IC 014. US 002 027 028 050. G & S: ITEMS MADE OF PRECIOUS METAL, NAMELY JEWELRY BOXES, HAT PINS AND FLOWER BOWLS; BADGES OF PRECIOUS METALS

IC 016. US 002 005 022 023 029 037 038 050. G & S: JOURNALS, BOOKS, MANUALS, AND TECHNICAL BULLETINS ALL DEALING WITH THE GENERATION, TRANSMISSION AND DISTRIBUTION OF ELECTRIC ENERGY, AND PRODUCTS, SYSTEMS AND SERVICES FOR INDUSTRIAL PROCESSES AND BUILDING SYSTEMS

IC 017. US 001 005 012 013 035 050. G & S: RUBBER, GUTTA-PERCHA, GUM, ASBESTOS, AND MICA FOR USE IN THE CONSTRUCTION INDUSTRY, AND AUTOMOBILE INTERIORS; RUBBER, GUTTA-PERCHA, GUM, ASBESTOS, AND MICA IN THE FORM OF PELLETS, SHEETS, RODS, SLABS AND SHAPED PIECES; PLASTIC IN EXTRUDED FORM FOR GENERAL INDUSTRIAL USE; PLASTIC IN EXTRUDED FORM FOR USE IN MANUFACTURE OF SHOES, FURNITURE, PROTECTIVE HELMETS, AUTOMOBILE INTERIORS; PLASTIC AND RUBBER PADDING FOR SHIPPING CONTAINERS; GLASS FIBERS FOR USE IN THE MANUFACTURE OF BUILDING INSULATION

IC 018. US 001 002 003 022 041. G & S: LEATHER AND IMITATION LEATHER SOLD IN BULK, ANIMAL SKINS, TRUNKS AND TRAVELING BAGS; UMBRELLAS, PARASOLS AND WALKING STICKS; BAGS MADE OF LEATHER OR CLOTH, NAMELY, SPORT BAGS, BACKPACKS, HANDBAGS, BAGS WORN AROUND THE WAIST, HAVERSACKS, CLUTCHES, MOUNTAIN CLIMBING BACKPACKS, HIKING BACKPACKS, SKIING BACKPACKS, SHOE BAGS FOR TRAVEL, RUCKSACKS, SCHOOL BAGS, TRAVEL BAGS WITH WHEELS, MONEY HOLDERS IN THE NATURE OF WALLETS SOLD EMPTY, EMPTY TOOL BAGS, GARMENT BAGS FOR TRAVELING, AND LEATHER STRAPS, EMPTY PURSES NOT OF PRECIOUS MATERIAL; WHIPS AND SADDLERY

IC 019. US 001 012 033 050. G & S: BUILDING MATERIALS, NAMELY WALL, HARDWOOD, DECKING, WOOD PARTICLE; BOARDS; ASPHALT

IC 020. US 002 013 022 025 032 050. G & S: FURNITURE, NAMELY, TABLES, CHAIRS, SOFAS, ARMCHAIRS, BASES FOR SOFA BEDS, FURNITURE MIRRORS, PICTURE FRAMES IN METAL, WOOD, CORK, REED, CANE, WICKER, HORN, BONE, IVORY, WHALEBONE, SHELL, AMBER, MOTHER-OF-PEARL, MEERSCHAUM AND PLASTICS AND FITTINGS AND PARTS THEREFOR

IC 021. US 002 013 023 029 030 033 040 050. G & S: COOKING UTENSILS, NAMELY, GRILLS; HOUSEHOLD UTENSILS, NAMELY, GRATERS, SIEVES, SPATULAS, STRAINERS AND TURNERS, STEEL WOOL FOR CLEANING, BEVERAGE GLASSWARE; FIGURES MADE OF CHINA, CRYSTAL , EARTHENWARE, GLASS, PORCELAIN, TERRA COTTA, PORCELAIN OR EARTHENWARE DOORKNOBS; CAKE AND FOOD DECORATING BAGS, TUBES AND COUPLERS THEREFOR

IC 025. US 022 039. G & S: CLOTHING, NAMELY, FOOTWEAR AND HEADWEAR

IC 026. US 037 039 040 042 050. G & S: LACE TRIMMING AND EMBROIDERY; RIBBONS AND BRAID; SHIRT BUTTONS, HOOKS AND EYES, SAFETY AND ORNAMENTAL NOVELTY PINS; NEEDLES; ARTIFICIAL FLOWERS

IC 035. US 100 101 102. G & S: DISSEMINATION OF ADVERTISING MATTER; ADVERTISING AGENCIES, NAMELY, PROMOTING THE SERVICES OF TECHNOLOGY AND INDUSTRY THROUGH THE DISTRIBUTION OF PRINTED AND AUDIO PROMOTIONAL MATERIALS AND BY RENDERING SALES PROMOTION ADVICE; BUSINESS INFORMATION MANAGEMENT IN THE FIELD OF TECHNOLOGY AND INDUSTRY; BUSINESS CONSULTATION; PUBLIC OPINION POLLING; ORGANIZING EXHIBITIONS FOR COMMERCIAL PURPOSE; CONDUCTING BUSINESS RESEARCH AND SURVEYS; EXPORT AND IMPORT AGENCIES; INSURANCE CLAIMS AUDITING SERVICES

IC 036. US 100 101 102. G & S: BROKERAGE IN THE FIELD OF FINANCIAL AFFAIRS, INSURANCE, STOCKS, COMMODITIES, INVESTMENT; ACCIDENT INSURANCE UNDERWRITING; FINANCIAL ANALYSIS AND CONSULTATION

IC 037. US 100 103 106. G & S: BUILDING CONSTRUCTION AND REPAIR; INSTALLATION OF COMPUTER NETWORKS AND COMPUTER SYSTEMS; MACHINERY MAINTENANCE AND REPAIR

IC 038. US 100 101 104. G & S: PROVIDING TELECOMMUNICATIONS CONNECTIONS TO A GLOBAL COMPUTER NETWORK; TELECOMMUNICATION SERVICES, NAMELY, LOCAL AND LONG DISTANCE TRANSMISSION OF VOICE, DATA, GRAPHICS BY MEANS OF TELEPHONE,

TELEGRAPHIC, CABLE, AND SATELLITE TRANSMISSIONS; ELECTRONIC MESSAGING SYSTEM, NAMELY, ELECTRONIC QUEUING SERVICES

IC 039. US 100 105. G & S: TRANSPORT BY FERRY, BOAT, RAIL, AIR, CAR AND LORRY; FREIGHT FORWARDING; STORAGE OF COMMERCIAL AND INDUSTRIAL GOODS

IC 040. US 100 103 106. G & S: FUEL TREATMENT SERVICES; METAL TREATMENT; RECYCLING; WASTE TREATMENT; FUEL REFINING; LEASING OF ENERGY GENERATING EQUIPMENT

IC 041. US 100 101 107. G & S: CONDUCTING WORKSHOPS AND SEMINARS IN THE FIELD OF COMPUTERS, ENGINEERING,TECHNOLOGY AND INDUSTRY; EDUCATIONAL SERVICES NAMELY CONDUCTING CLASSES, SEMINARS, CONFERENCES AND WORKSHOPS IN THE FIELD OF COMPUTERS, ENGINEERING,TECHNOLOGY AND INDUSTRY; ORGANIZING EXHIBITIONS FOR EDUCATIONAL, CULTURAL, SPORTING AND ENTERTAINMENT PURPOSE

IC 042. US 100 101. G & S: ENGINEERING; TECHNICAL CONSULTATION AND RESEARCH IN THE FIELD OF ENGINEERING; LEASING OF COMPUTERS AND COMPUTER FACILITIES; CONSULTING SERVICES IN THE FIELD OF DESIGN, SELECTION, IMPLEMENTATION AND USE OF COMPUTER HARDWARE AND SOFTWARE SYSTEMS FOR OTHERS; LEGAL SERVICES

| | |
|---|---|
| Mark Drawing Code | (5) WORDS, LETTERS, AND/OR NUMBERS IN STYLIZED FORM |
| Serial Number | 76385319 |
| Filing Date | March 18, 2002 |
| Current Filing Basis | 44E |
| Original Filing Basis | 1B;44D |
| Published for Opposition | November 25, 2003 |
| Registration Number | 2904097 |
| Registration Date | November 23, 2004 |
| Owner | (REGISTRANT) ABB Asea Brown Boveri Ltd. CORPORATION SWITZERLAND Affolternstrasse 44 CH-8050 Zurich SWITZERLAND |
| Attorney of Record | Adrienne L. White, Esquire |
| Priority Date | October 5, 2001 |
| Prior Registrations | 1674702;1695820;1866114;2268027;AND OTHERS |
| Type of Mark | TRADEMARK. SERVICE MARK |
| Register | PRINCIPAL |
| Live/Dead Indicator | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP |

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

Trademark Electronic Search System (TESS)                                        Page 5 of 5

Trademark Electronic Search System (TESS)                                        Page 1 of 2



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Fri Jul 23 03:54:30 EDT 2010*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP |

Logout  Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

| TARR Status | ASSIGN Status | TDR | TTAB Status |   *( Use the "Back" button of the Internet Browser to return to TESS)*



| **Word Mark** | ABB |
|---|---|
| **Goods and Services** | IC 009. US 021 023 026 036 038. G & S: electrical and electronic apparatus and devices for the transmission and distribution of electrical energy, namely, electronic data processors; computer programs for use in connection with the monitoring and controlling of the transmission and distribution of electrical energy; cables and leads for the transmission of electric power and electronic signals; electronic bus systems, namely, conductors in a data processor for carrying information electronically; industrial magnets; electrical transformers; electrical sensors for detecting power interruptions and power fluctuations; electrical switch gear, namely, electrical switches for a power station or a transforming station or an electrical control system for a building; residual current operated circuit breakers; miniature circuit breakers; electric motor protecting switches; fusible links, namely, devices to protect electrical circuits from overloads, surges or shorts; electric and electronic isolators, low-voltage capacitors; electrical distribution circuit boards; meter cabinets; power consumption meters; ballasts for lighting controlled devices; electrical switch boards; switch cabinets; semiconductor switch gear, namely, electrical switches for a power station or a transforming station or an electrical control system for a building; high-voltage and medium-voltage electrical switches; electrical and electronic contactors; electrical and electronic relays, namely, remote control relays and time relays; electric and electronic push button switches; electric plugs and sockets; bushings, namely, cable bushings for use in circuit breakers and current transformers; electrical measuring instruments, namely, time clocks, operating time meters, timers for recording and measuring electric currents, ammeters, volt meters. control and protective equipment for electrical networks, namely, voltage surge protectors, fire alarms, anti-intrusion alarms, theft alarms, personal security alarms, and emergency warning lamps

IC 016. US 002 005 022 023 029 037 038 050. G & S: publications, namely, journals, manuals, reference books, catalogues, and brochures all featuring electrical and electronic equipment and components thereof

IC 037. US 100 103 106. G & S: construction planning, installation and maintenance of electrical control installations and switching installations for the safety, monitoring, control and switching of electrical equipment for use in the fields of industrial technology and building service technology |

IC 042. US 100 101. G & S: design for others of electrical control installations and switching installations for the safety, monitoring, control and switching of electrical equipment for use in the fields of industrial technology and building service technology

| | |
|---|---|
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 26.11.12 - Rectangles with bars, bands and lines<br>26.11.21 - Rectangles that are completely or partially shaded |
| **Serial Number** | **75208225** |
| **Filing Date** | December 3, 1996 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 1B;44D |
| **Published for Opposition** | May 18, 1999 |
| **Registration Number** | 2268027 |
| **Registration Date** | August 10, 1999 |
| **Owner** | (REGISTRANT) ABB Asea Brown Boveri Ltd. CORPORATION SWITZERLAND Affolternstrasse 44 8050 Zurich SWITZERLAND |
| **Attorney of Record** | James M. Slattery (Reg. No. 28,380) |
| **Priority Date** | June 14, 1996 |
| **Prior Registrations** | 1674702;1777685;1866114;AND OTHERS |
| **Description of Mark** | The drawing of the mark is lined for the color red. |
| **Type of Mark** | TRADEMARK. SERVICE MARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20090727. |
| **Renewal** | 1ST RENEWAL 20090727 |
| **Live/Dead Indicator** | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

Trademark Electronic Search System (TESS)                                         Page 1 of 2

 **United States Patent and Trademark Office**

Home|Site Index|Search|FAQ|Glossary|Guides|Contacts|eBusiness|eBiz alerts|News|Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Fri Jul 23 03:54:30 EDT 2010*

**TESS HOME**  **NEW USER**  **STRUCTURED**  **FREE FORM**  **BROWSE DICT**  **SEARCH OG**  **BOTTOM**  **HELP**

**Logout** Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

**TARR Status**  **ASSIGN Status**  **TDR**  **TTAB Status** *( Use the "Back" button of the Internet Browser to return to TESS)*

## Typed Drawing

| | |
|---|---|
| **Word Mark** | ABB |
| **Goods and Services** | IC 005. US 018. G & S: animal blood and components thereof, namely whole blood, blood plasma, red blood cells and anticoagulant solutions for use in blood bags. FIRST USE: 19881209. FIRST USE IN COMMERCE: 19890310 |
| | IC 010. US 044. G & S: veterinarian products for transfusions and handling of animal blood, namely blood collection bags, blood transfer bags, tubing for veterinarian transfusions, spikes, clips, temperature monitors, sealers, labels and cartons for blood containers, plasma extractors, vacuum chambers, scales, blood filters and screens. FIRST USE: 19881209. FIRST USE IN COMMERCE: 19890310 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 74498063 |
| **Filing Date** | March 7, 1994 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | April 11, 1995 |
| **Registration Number** | 1940473 |
| **Registration Date** | December 12, 1995 |
| **Owner** | (REGISTRANT) Kaufman, Patricia M. DBA Animal Blood Bank INDIVIDUAL UNITED STATES P.O. Box 1118 Dixon CALIFORNIA 956201118 |
| | (LAST LISTED OWNER) ANIMAL BLOOD BANK, INC. CORPORATION CALIFORNIA P.O. BOX 1118 DIXON CALIFORNIA 956201118 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of** | Kathleen A. Skinner |

**Record**
**Type of Mark**   TRADEMARK
**Register**   PRINCIPAL
**Affidavit Text**   SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20060428.
**Renewal**   1ST RENEWAL 20060428
**Live/Dead Indicator**   LIVE

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP |

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

Trademark Electronic Search System (TESS)                                           Page 1 of 2

 **United States Patent and Trademark Office**

Home|Site Index|Search|FAQ|Glossary|Guides|Contacts|eBusiness|eBiz alerts|News|Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Fri Jul 23 03:54:30 EDT 2010*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP |

Logout Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*

### Typed Drawing

| | |
|---|---|
| **Word Mark** | ABB |
| **Goods and Services** | IC 009. US 026 038. G & S: distributed process control systems comprising sensors, computers, microprocessors, computer peripherals and computer software for distributed process control; measurement and control systems comprising sensors, computers, microprocessors, computer peripherals and computer software for measurement and control; automated process supervision and regulatory systems comprising sensors, computers, microprocessors, computer peripherals and computer software for process supervision and regulation; paper machine control systems comprising sensors, computers, microprocessors, computer peripherals and computer software for paper machine control; sheet inspection systems comprising sensors, computers, microprocessors, computer peripherals and computer software for sheet inspection; gas chromatography apparatus; namely, gas and supercritical chromatographs; infrared and ultraviolet photometers; chemical analyzers for on-line industrial applications for analyzing and monitoring chemicals within a process stream. FIRST USE: 19901000. FIRST USE IN COMMERCE: 19901000

IC 011. US 031 034. G & S: electrostatic precipitators and wet and dry filtering installations; units and installations for removing or treating pollutants in an exhaust stream; gas-to-gas heat exchange units, air preheaters, thermal catalytic and regenerative oxidizing units; all of the foregoing for industrial use in factories, processing plants and waste disposal facilities and for use in the electric generating utilities; industrial plants for the production, distillation, refining and treatment of oil, gas, petroleum, hydrocarbon and chemical products and component parts therefor. FIRST USE: 19901217. FIRST USE IN COMMERCE: 19901217

(CANCELLED) IC 036. US 100 101 102. G & S: [investment advisory services]. FIRST USE: 19881101. FIRST USE IN COMMERCE: 19881101

IC 037. US 100 103 106. G & S: repair, maintenance, refueling, examination and inspection of [ nuclear reactor and ] steam generating power plant components and systems; hazardous waste cleanup and disposal for others; [above and below ground, building construction;] custom construction of [broadcasting facilities,] insulating systems, industrial plants and industrial furnaces; installation, examination, supervision, maintenance and repair of [radio and telecommunications equipment and] heating, ventilating and air-conditioning systems for industrial, cold-storage and machinery plants; installation, inspection, maintenance and repair of building insulation; laying of pipelines; installation of solar heating/cooling and electric power generation systems; repair and maintenance of electronic and electrotechnical equipment, mechanical engineering products, [precision tools, medical apparatus and installations, automobiles, airplanes, marine vessels and locomotives,] thermodynamical equipment; |

laying of land and sea cables; custom installation of robotic systems for others. FIRST USE: 19900501. FIRST USE IN COMMERCE: 19900501

IC 041. US 107. G & S: educational services; namely, conducting courses and seminars in the field of power generation and processing; publication of books, magazines and newspapers; training in the use and operation of robotic systems. FIRST USE: 19901022. FIRST USE IN COMMERCE: 19901022

IC 042. US 100 101. G & S: engineering services; computer programming for others; leasing of data processing equipment; computer software design for others; environmental consulting, risk assessment * AND MONITORING; MEASUREMENT * EVALUATIONS IN THE POWER GENERATION AND PROCESS INDUSTRIES, TESTING AND INSPECTING, CONSULTING SERVICES IN THE FIELD OF POWER GENERATION AND PROCESSING, EDITING OF BOOKS, MAGAZINES AND NEWSPAPERS; COMPUTER AIDED DESIGN SERVICES IN THE FIELD OF ROBOTICS. FIRST USE: 19900420. FIRST USE IN COMMERCE: 19900420

| | |
|---|---|
| Mark Drawing Code | (1) TYPED DRAWING |
| Serial Number | 74165392 |
| Filing Date | May 10, 1991 |
| Current Filing Basis | 1A |
| Original Filing Basis | 1A |
| Published for Opposition | March 30, 1993 |
| Change In Registration | CHANGE IN REGISTRATION HAS OCCURRED |
| Registration Number | 1777685 |
| Registration Date | June 22, 1993 |
| Owner | (REGISTRANT) ABB Asea Brown Boveri Ltd. CORPORATION SWITZERLAND Affolternstrasse 44 8050 Zurich SWITZERLAND |
| Attorney of Record | ADRIENNE L. WHITE |
| Type of Mark | TRADEMARK. SERVICE MARK |
| Register | PRINCIPAL |
| Affidavit Text | SECT 15. PARTIAL SECT 8 (6-YR). SECTION 8(10-YR) 20030925. |
| Renewal | 1ST RENEWAL 20030925 |
| Live/Dead Indicator | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP |

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Fri Jul 23 03:54:30 EDT 2010*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP |

[Logout] Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*

### Typed Drawing

**Word Mark**  ABB

**Goods and Services**  IC 006. US 002 012 013 014 023 025 050. G & S: [ METAL MOLDS FOR FOUNDRY FURNACES; METAL CASTINGS AND FORGINGS FOR USE IN THE FURTHER MANUFACTURE OF MACHINE PARTS; ] SUPPORT MASTS FOR OVERHEAD ELECTRICAL-CONTACT LINES FOR RAILWAYS, METAL CABLES AND WIRES; METAL PIPES AND FITTINGS THEREFOR; [ METAL PIPE COUPLINGS AND JOINTS; METAL SAFES; STEEL CYLINDERS WOUND WITH WIRE OR IN STRIP; ORES; COPPER AND ALUMINUM BARS AND ROPES; STEEL IN SHEET, ROD, BAR AND BILLET FORM ]

IC 007. US 013 019 021 023 031 034 035. G & S: ELECTRIC MOTORS AS PARTS OF MACHINES; COMPRESSORS FOR SUPERCHARGING INTERNAL-COMBUSTION ENGINES; [ COUPLINGS FOR MACHINES AND BELTS FOR MACHINES AND ENGINES; INCUBATORS FOR EGGS; ] INDUSTRIAL MACHINE PRESSES, HYDRAULIC COIL PRESSES, HIGH PRESSURE METAL FORMING PRESSES; SHEET METAL FORMING PRESSES; HOT AND COLD ISOSTATIC PRESSES; [ STANDS FOR USE IN ROLLING MILLS; ELECTRICAL CRANES, HOISTS, CONVEYERS AND ELEVATORS, WINCHES, SHAFT HOISTS FOR MINES; ELECTRIC MOTOR PLOUGHS; ORE SEPARATORS; ] INDUSTRIAL ROBOTS; [ GEARINGS; ] GEARED MOTORS AS PARTS OF MACHINES; MOTOR DRIVES FOR INDUSTRIAL PURPOSES, ELECTRIC VARIABLE SPEED DRIVES FOR MACHINES; [ MACHINES FOR PRODUCING METAL POWDER; ] GAS, STEAM AND WATER TURBINES, COMPRESSORS FOR MACHINES, LIQUID PUMPS, STEAM, HYDRO AND DIESEL-DRIVEN ELECTRICAL POWER GENERATORS, ELECTRIC GENERATORS IN COMBINATION WITH STEAM ENGINES, INTERNAL-COMBUSTION ENGINES; [ FILTERING MACHINES; ELECTROMECHANICAL MACHINES FOR PROCESSING FOODSTUFFS AND BEVERAGES; INDUSTRIAL CENTRIFUGES; MANGLERS, WASHING MACHINES, DISH-WASHERS; MACHINING TOOLS, NAMELY CUTTING TOOLS, GRINDING TOOLS FOR METALS AND OTHER HARD MATERIALS, POWER-OPERATED SAWS, ELECTRIC DRILLS, CUTTERS AND THREADING TOOLS; ELECTRIC GRINDING WHEELS, GRINDSTONES, FILES AND CHISELS; ] TURBOCHARGERS, SUPERCHARGERS, [ PRESSURE WAVE MACHINES AND TURBOCHARGERS FOR TURBINES AND ENGINES; EMERGENCY GENERATING SETS TO MAINTAIN VENTILATION AND LIGHTING IN THE EVENT OF A POWER FAILURE; ] MOTOR-GENERATOR SETS FOR FREQUENCY AND POWER CONTROL; A.C., D.C., SYNCHRONOUS AND ASYNCHRONOUS MOTORS OF ALL SIZES; MOTOR-DRIVEN COMPRESSORS; TURBO-DYNAMOS; SCAVENGING BLOWERS; [ GEARS AND GEAR COUPLINGS; JIGS; ELECTRIC LADLES AND POURING UNITS AND MOLDING MACHINES; ELECTRIC ORE SEPARATORS; ELECTRIC CAN OPENERS; ELECTRIC COFFEE GRINDERS. ] MARINE PROPULSION MACHINES - NAMELY STEAM AND GAS TURBINES, GEARING AND PROPULSION DRIVES, AND TURBO,

DIESEL AND GAS TURBO POWERED ELECTRIC DRIVES; [ CENTRIFUGAL LIQUEFIERS, ELECTRIC VEGETABLE CUTTERS, ELECTRIC MOTOR STARTERS; PUMPS FOR REFRIGERATOR MOTORS, ENGINE TURBINES, TRANSMISSION DRIVE TRAINS, AXLE DRIVES AND GEARING FOR BOATS; INDUSTRIAL ROBOTIC ARMS; AND PARTS FOR ALL OF THE FOREGOING ]

IC 009. US 021 023 026 036 038. G & S: [ WELDING FIXTURES, ELECTRIC WELDING MACHINES AND SOLDERING MACHINES; ELECTRIC IRONING MACHINES; TRANSMITTING TUBES, ANTENNAS; ] COMPUTERS, MICROPROCESSORS, ELECTRONIC DATA PROCESSING APPARATUS COMPRISING VISUAL DISPLAY UNITS AND PRINTERS; [ MAGNETIC RECORDING CHARTS, ] COMPUTER PROGRAMS; [ FIRE EXTINGUISHERS; ] THYRISTORS, TRANSISTORS, DIODES, ELECTRIC CONVERTERS, TRIACS AND HYBRID CIRCUITS, ELECTRIC POWER CONVERTERS, STATIC CONVERTERS, TRANSFORMERS; MAGNETS; ELECTRIC RESISTORS; TERMINALS, SWITCHES, CONTACTS AND INTERRUPTERS; ELECTRIC SWITCHES AND TRIPPING UNITS, ELECTRIC SWITCHBOARDS AND SWITCHGEAR, ELECTRIC RELAYS AND INSULATORS AND ENCLOSURES FOR THE SAME; ELECTRIC CAPACITORS, SYNCHRONOUS CAPACITORS; SURGE ARRESTERS, ELECTRICAL CONTACT SEPARATING UNITS, ELECTRIC REACTORS, SHUNT REACTORS; CURRENT COLLECTORS, TAP CHANGERS FOR ELECTRIC TRANSFORMERS; ELECTRIC SOCKETS AND BUSHINGS; [ BATTERY CHARGERS AND BATTERY CHARGE CHECKING AND MEASURING UNITS; ] ELECTRIC PROTECTIVE RELAYS, [ CABLE TERMINAL BOXES, CABLE JUNCTION BOXES; ] ELECTRICAL FUSES, [ AMMETERS, LIGHTNING ARRESTERS, ELECTRIC SIGNAL BOXES; ACOUSTIC AND OPTICAL SIGNALLING UNITS, ANNUNCIATORS, OPTICAL STAFF LOCATING UNITS, TELEPHONES AND CONNECTORS FOR TELEPHONE SYSTEMS, RADIO AND TELEPHONE LOUDSPEAKERS; ACCUMULATORS; FUEL CELLS AND BATTERIES; ELECTRICAL INDICATING AND WARNING UNITS; SOLID-STATE INTEGRATED ELECTRONIC CIRCUITS; OPTOELECTRONIC UNITS; FIBRE-OPTIC CABLES AND LIGHT AND IMAGE CONDUITS; PHOTOCELLS; ] HIGH-VOLTAGE DIRECT-CURRENT TRANSMISSION UNITS; SWITCHGEAR AND CONTROLGEAR; [ ELECTRONIC DYNAMOMETERS AND TORQUEMETERS, ELECTRONIC LOAD INDICATORS; ELECTRIC IRONS, VACUUM CLEANERS AND FLOOR POLISHERS; ] [ NUCLEAR REACTORS; ] STATIC RECTIFIERS; STATIC INVERTERS; CAPACITOR BANKS; * ELECTRICAL HIGH VOLTAGE DIRECT CURRENT POWER TRANSMISSION UNITS * [ MAGNETOELASTIC LOAD CELLS, ELECTRONIC SCALES; ELECTRONIC FORCE AND TORQUE MEASURING APPARATUS; ELECTRONIC LOAD INDICATORS. ELECTRICAL AND ELECTRONIC TRANSDUCERS, TRANSMITTERS, DETECTORS, DISPLAY TERMINALS, REGULATORS AND CONTROLLERS; CONTROL EQUIPMENT FOR ELECTRICAL GENERATING STATIONS, ELECTRICAL AND ELECTRONIC TRANSDUCERS, TRANSMITTERS, DETECTORS, REGULATORS, AND CONTROLLERS FOR CONTROLLING AND SUPERVISING ELECTRIC POWER GENERATION, ELECTRIC POWER TRANSMISSION, ELECTRIC POWER DISTRIBUTION, INDUSTRIAL PROCESSES AND THE OPERATION OF VEHICLES; DISPLAY TERMINALS AND COMPUTERS FOR CONTROLLING AND SUPERVISING ELECTRIC POWER DISTRIBUTION AND INDUSTRIAL PROCESSES; OPTOELECTRONIC SENSORS; ] [ ELECTRICAL HIGH VOLTAGE DIRECT CURRENT POWER TRANSMISSION UNITS; ELECTRICAL SYNCHRONOUS CONDENSORS; ] ELECTRICAL BUSHINGS; [ INDUCTION STIRRERS FOR USE WITH METALLIC MELTS; ] ELECTRICAL SENSING, SIGNAL PROCESSING AND ELECTRICAL CONTROL AND REGULATING CIRCUITS AND MACHINES FOR CONTROLLING ENGINES, TURBINES, POWER PLANTS AND INDUSTRIAL PROCESSES; ELECTRIC SAFETY FUSE CUTOUTS FOR GENERATORS; CONTROL PANELS, CONTROL DESKS AND CONTROL DESK SWITCHBOARDS; DIGITAL AND ANALOG CIRCUITS AND APPARATUS FOR DATA PROCESSING; [ EQUIPMENT AND INSTALLATIONS FOR POWER SYSTEM PROTECTION; NAMELY ARC SUPPRESSION COILS, RELAYS AND CONTACTORS; ] ISOLATORS, FUSES, CIRCUIT BREAKERS; [ COUNTERS AND SWITCHES OF ALL SIZES FOR VARIOUS INDUSTRIAL APPLICATIONS; FUSE GEAR AND ] RELAY TESTERS; ELECTRICAL METERS FOR LABORATORY AND INDUSTRIAL USE; ELECTRICAL RECTIFIERS, INVERTERS, FREQUENCY CONVERTERS, COMPENSATORS, PHASE SHIFTERS, CONTACTS AND STATIC CONVERTERS; [ ELECTRICAL CHARGING APPARATUS; ELECTRICAL BATTERIES; ELECTRICAL CONTROL CIRCUITS FOR TRACTION VEHICLES; AUDIO AND VISUAL ALARM INDICATORS; SWITCHBOARDS CIRCUITS; FURNACE AND AIR CONDITIONER CONTROLS; RADIO TRANSMITTERS FOR SHIPS AND COASTAL RADIO STATIONS; TRANSMITTING AND RECTIFYING TUBES; RADIO SETS; RADIO AND TELEPHONE RELAYS; TELEVISION TRANSMITTERS; TRANSMITTERS FOR RADIO BROADCAST AND RADIO-TELEGRAPHY; ANTENNAS AND ANTENNA CHANGEOVER CIRCUITS; ELECTRON TUBES AND ELECTRON DISCHARGE APPARATUS; ELECTRICAL CAPACITORS. SOLID STATE ELECTRONIC APPARATUS - NAMELY, LIGHT DIMMERS; THERMOELECTRIC CONVERTERS; TAPE RECORDERS AND DICTATION MACHINES; DYNAMOMETERS; ]

ELECTRICAL TRANSMISSION LINES, CABLE, WIRE AND CONDUCT; [ NUMERICAL CONTROL ATTACHMENTS FOR MECHANICAL AND ELECTRICAL CONTROL FOR BORING AND MILLING MACHINES AND VARIABLE SPEED AND MAIN AND FEED DRIVES USED IN THE METAL FABRICATION INDUSTRY; ELECTRICAL POWER SUPPLY BUSSES, CABLES, SUPPORTS AND CONTACTS FOR ELECTRICAL TRACTION VEHICLES, AND ELECTRICAL CIRCUITS FOR MONITORING, CONTROLLING AND DISPLAYING OPERATIONS AND OPERATING CONDITIONS IN RAILWAYS SYSTEMS; ELECTRICAL TRANSDUCERS, SIGNAL PROCESSES AND INDICATING AND RECORDING MACHINES FOR MEASURING AND TESTING INSTRUMENTS AND FOR USE WITH REGULATING AND CONTROL APPARATUS; ALTERNATING CURRENT EXCITERS WITH ROTATING DIODES; OZONIZERS FOR USE IN WATER SUPPLY SYSTEMS, CHEMICAL PLANTS AND INDUSTRY; ] STATIC VAR SOURCES; UNINTERRUPTIBLE POWER SUPPLIES; VOLTAGE REGULATORS AND SYNCHRONIZATION APPARATUS FOR SYNCHRONOUS MACHINES; ELECTROLYSERS FOR THE DISSOCIATION OF WATER; [ GALVANIZING AND ELECTROPHORESIS UNITS; SUPERCONDUCTORS; SYSTEM MODULES FOR THE ACQUISITION AND DISPLAY OF DATA; ] LOW VOLTAGE SWITCHGEAR, I;P; CONTRACTORS, THERMAL RELAYS, COMPONENTS OF AUTOMATION SYSTEMS; NAMELY, PUSH-BUTTONS, TIME-LAG RELAY, MICROSWITCHES AND LIMIT SWITCHES, COUNTERS AND PROXIMITY SENSORS, EXPLOSION-PROOF UNITS, CIRCUIT BREAKERS, LOAD SWITCHES AND ISOLATORS, HIGH POWER FUSES, ACCESSORIES FOR DOMESTIC INSTALLATIONS, NAMELY SWITCHES, PLUGS AND SOCKETS, FUSEGEAR, DISTRIBUTION BOARDS, STANDARD COMPONENTS FOR LIGHTING SCHEMES, ALARMS AND WARNING APPARATUS; SEMICONDUCTOR STRUCTURAL COMPONENTS; [ ELECTRON TUBES; GAS-ELECTRIC, STEAM-ELECTRIC AND HYDRO-ELECTRIC POWER SUPPLY UNITS; AND PARTS FOR ALL OF THE FOREGOING ]

IC 011. US 013 021 023 031 034. G & S: [ FURNACES OF ALL KINDS; ] DISTRICT HEATING PIPES; BOILERS OF ALL KINDS; [ TOASTERS, SOLAR COLLECTORS, ELECTRIC FANS, REFRIGERATING UNITS; ] STEAM GENERATORS; ELECTRICAL AND FUEL POWERED HEATERS FOR INDUSTRIAL APPLICATION; [ REFRIGERATING PLANTS FOR FREIGHT CARRYING VEHICLES; AIR COOLERS AND OIL COOLERS; RAW WATER EVAPORATORS; ] COOLING TOWERS; [ AIR CONDITIONERS, HUMIDIFIERS, VENTILATORS, STOVE HOODS; ] FEEDWATER HEATERS AND CONDENSERS; SEA WATER DESALINATION PLANTS; SOLAR PANELS FOR UTILIZATION OF SOLAR ENERGY; [ ELECTRIC LIGHTS FOR ALL PURPOSES AND APPLICATIONS; DISCHARGE LAMPS FOR LIGHTING; HOT WATER HEATERS; ELECTRICAL HEATERS; ELECTRIC STOVES, SPACE HEATERS, GRILLS, BROILERS, AND PLATE WARMERS; SUN-RAY LAMPS; OVENS, COOKERS AND RANGES; REFRIGERATORS, FREEZERS AND ICE MAKING MACHINES; AIR CONDITIONING MACHINES FOR RAILROADS; ELECTRIC HAND HELD HAIR DRYERS, AUTOMATIC EGG BOILERS; INDUCTION HEATERS; ] STEAM GENERATORS FOR POWER PLANTS, [ CLOTHES DRYERS; AND PARTS FOR ALL OF THE FOREGOING ]

IC 012. US 019 021 023 031 035 044. G & S: [ FORK LIFT TRUCKS, ] LOCOMOTIVES AND MOTORCOACHES, TRAMS, RAILWAY COACHES, TROLLEY BUSES; MOTORS AND DRIVES FOR LAND VEHICLES; BRAKES FOR LAND VEHICLES; TRUCKS; MOTORS, ENGINES, TURBINES, TRANSMISSIONS, DRIVE TRAINS, AXLE DRIVES AND GEARING FOR LOCOMOTIVES, TRAMS, UNDERGROUND RAILWAYS, TROLLEY BUSES, RACK AND FUNICULAR AND ROPE RAILWAYS AND CABLE CARS, AND BOATS AND SHIPS; ELECTRIC DRIVES FOR RAILBOUND VEHICLES; ANTI-SLIP MECHANISMS FOR VEHICLES; FUNICULAR RAILWAYS; AND PARTS FOR ALL OF THE FOREGOING

IC 016. US 038. G & S: PRINTED JOURNALS AND MAGAZINES, BOOKLETS AND BOOKS FOR THE ELECTRICAL AND MECHANICAL ENGINEERING INDUSTRY, PUBLICATIONS CONTAINING PROGRAM DESCRIPTIONS

| | |
|---|---|
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 73728906 |
| **Filing Date** | May 17, 1988 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 44D |

| Published for Opposition | February 19, 1991 |
| --- | --- |
| Change In Registration | CHANGE IN REGISTRATION HAS OCCURRED |
| Registration Number | 1674702 |
| Registration Date | February 11, 1992 |
| Owner | (REGISTRANT) ABB ASEA BROWN BOVERI LTD. CORPORATION SWITZERLAND AFFOLTERNSTRASSE 44 CH-8050 ZURICH SWITZERLAND |
| Attorney of Record | ADRIENNE L WHITE |
| Priority Date | February 16, 1988 |
| Type of Mark | TRADEMARK |
| Register | PRINCIPAL |
| Affidavit Text | SECT 15. PARTIAL SECT 8 (6-YR). SECTION 8(10-YR) 20020421. |
| Renewal | 1ST RENEWAL 20020421 |
| Live/Dead Indicator | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY