UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ABB INC.,

    Plaintiff,

v.

ROBOTIC VISIONTECH, LLC,
BRAINTECH, INC., and BRAINTECH
CANADA, INC.

    Defendants.

Case No. 5:10-cv-12626-JCO-PJK

Judge John Corbett O'Meara
Magistrate Judge Paul J. Komives

### DECLARATION OF FREDERICK WEIDINGER IN SUPPORT OF DEFENDANT ROBOTICVISIONTECH, LLC'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

I, Frederick Weidinger, do hereby make this Declaration in Support of Defendant RoboticVISIONTech, LLC's ("RVT") Opposition to Plaintiff ABB Inc.'s Motion for Preliminary Injunction. On the basis of my personal knowledge, I state as follows:

1. I am more than 18 years of age and am competent to testify as a witness.

2. I have personal knowledge of the matters set forth in this Affidavit.

3. I am President and Chief Executive Officer of RVT.

4. I have reviewed the Declaration of James P. Connelly, which was filed along with ABB's Motion. To the best of my recollection, Mr. Connelly was not personally involved in any dealings I had with ABB; in fact, I have never heard of him despite more than two years of dealings with ABB. This may explain why he incorrectly refers to me throughout his sworn statement as "Mr. Weindinger" and incorrectly refers to RVT as "Robotic Vision Tech, LLC". His speculation and surmise about the formation of RVT is also factually incorrect, as explained below.

1

5. ABB, like many other parties in the robotics industry, had every reason to know about the forthcoming disposition of the Braintech assets by auction. I believe this to be true because the auction was widely publicized on the Internet and in print media in several different states and locations. More to the point, ABB actually contacted Mr. VandeWyngearde, Braintech's former attorney, in regards to the public auction, several days before the public auction.

6. When Braintech defaulted on its loans in May 2010, Silicon Valley Bank (the "Bank") foreclosed on $1.7 million worth of collateral, including pledges of cash from the secured creditors. The secured creditors had absolutely nothing to do with the unilateral decision made by the Bank to foreclose. In turn, those secured creditors lost 100% of their pledged security and therefore foreclosed their secured liens against Braintech's assets in a commercially approved public foreclosure process, as permitted by valid and binding loan documents. A third-party auctioneer presided over the auction and it was carried out in strict compliance with the UCC. RVT is a separate corporation duly constituted in Nevada and is in good standing in the Commonwealth of Virginia. RVT made a winning bid at the auction and bought the auction assets free and clear of liens including those liens held by the Bank, who was the senior creditor. Although ABB knew about the Auction, ABB was not present at the auction, never asserted any lien rights, and never tried to stop the auction.

7. There was nothing nefarious about the auction or about the prior transfer of Braintech Canada's assets to Braintech, Inc. in 2009, after the expiration of ABB's contract with Braintech Canada in December 2008. The suggestion that Braintech, a public company, was involved in a "shell game" with RVT and others is a grave matter which I take very seriously as a CEO. This type of uninformed speculation -- from an attorney no less -- is false and libelous.

8. The Licensing Agreement ended by its terms on December 31, 2008. Moreover, the customer warranty period spelled out in the letter of clarification dated February 24, 2009 is <u>12 months running from the date ABB delivers a license from inventory</u>. During my Braintech tenure, which expired in March 2010, to the best of my knowledge, Braintech never received a single warranty request from ABB. Over a period of more than four years, ABB has never had any reason to access any executables associated with the eVisionFactory ("eVF") software for vision guided robotics ("VGR") workstations, let alone the Braintech source code. It is certainly suspicious that a few months after the auction, ABB now complains of "ongoing disruption and loss of business" without so much as identifying a single customer who has been affected negatively. No such claims ever have been presented to RVT and none was given to Braintech. In fact, until we were sued by ABB, we were looking forward to an enhanced business relationship. As the purchaser of these valuable assets, we were prepared to honor any such warranty claims if they existed and looked forward to renewing any license that ABB required under reasonable commercial terms to both parties. To show goodwill, RVT honored a 33% price discount Braintech had promised to ABB. As a new start-up company hiring Michigan employees, RVT welcomes any commercially reasonable new business.

9. ABB has not "invested large sums of money into Braintech for the purpose of developing robotic vision systems". ABB <u>purchased</u> off-the-shelf software licenses from Braintech Canada. Each guaranteed payment from ABB to Braintech Canada was documented by a detailed purchase order form depicting the type, mix and number of software licenses ABB was purchasing. There was certainly no explicit requirement that Braintech Canada spend any of the ABB proceeds developing software solely for the benefit of ABB.

10. During the spring of 2008, ABB specifically rejected the continued use of the eVF technology RVT bought at the auction. ABB selected another software company's technology for its future use.

11. ABB has absolutely no right to RVT's source code. RVT has a legal existence which is completely separate from Braintech. RVT legally and validly purchased all assets of Braintech without any obligation to ABB. In fact, RVT inherited a receivable owed by ABB to Braintech, Inc. in the sum of $5,000.00 which has not yet been paid by ABB, a multi-billion dollar corporation.

12. No escrow was ever established. Mr. Clark, who is referred to in Paragraph 18 of Mr. Connelly's affidavit (and in the Licensing Agreement), is unknown to me to the best of my recollection, and I am not aware that he was ever in possession of any escrowed materials. After the Licensing Agreement ended, Mr. VandeWyngearde was a depository for Braintech's software materials because he served as Braintech's lawyer, but he was not an escrow agent and there was no such thing as an escrow agreement among the parties. For example, there are no terms and conditions in the February 24, 2009 letter that specify any circumstances under which the Braintech software materials would have become available to ABB. If there were such, presumably ABB would be able to provide Mr. VandeWyngearde with binding instructions to act, which it has not done. Mr. VandeWyngearde and his firm have disavowed any obligation as escrow agents but have refused to return the code and escrow to us presumably for fear of lawsuits and legal liability to a multinational corporation with vast resources like ABB.

13. Even under the defunct Licensing Agreement, ABB would never own the source code or executables and ABB certainly has no right to continue to sell the eVF software let alone gain possession of, or uncontrolled access to, RVT's source code. The Licensing Agreement

could not be clearer on this point and it reads as such in all caps as follows: "FOR GREATER CLARITY THE LICENSEE HAS NO RIGHT OF OWNERSHIP OR RIGHT TO SELL THE BRAINTECH SOFTWARE IN THE EVENT THAT BRAINTECH CEASES TO OPERATE FOR WHATEVER REASON."

14. Braintech Canada invested over $20 million in the development of its software. Further, Braintech has invested over 100,000 man-hours researching and developing its source code.

15. ABB made purchases of software licenses of approximately $8-10 million. However, more than twice this sum was invested in the source code.

16. ABB was notified in advance by Braintech personnel that the robots were being moved. To the best of my knowledge, ABB never demanded a return of the two old and idle robots before they were moved to RVT's secure facility. In fact, we believed we were doing ABB a service by securing its robots.

17. After the auction, ABB's robots and other materials were moved for safekeeping from a vacant Braintech facility in Pontiac Michigan to a secure facility where RVT is carrying on its business in the Defense Corridor area in Sterling Heights.

18. RVT was contacted by the director of operations of ABB Auburn Hills in June 2010. Initially, ABB's operations director requested renewal of at least 21 RVT software developer keys. RVT made clear its desire to continue to service ABB. The ABB director misrepresented to RVT that the keys had a renewal price of $80 per developer key. This was patently untrue. Upon further investigation by RVT, we learned that ABB Germany had recently executed a purchase order to purchase the developer keys at $1,000 per key. The list price for developer key renewal is $1,500 per key, but we extended a $500 discount to ABB per key to

honor the previous ABB Germany purchase order and thus agreed to reduce the price to $1,000 per key for ABB. When RVT corrected ABB on this point ($1,000 per key and not $80 per key) and requested payment upfront ($21,000) for the renewals, ABB ceased speaking to RVT. For example, ABB did not timely respond to a business meeting that RVT was trying to set up with ABB during the same time RVT personnel were in the Auburn Hills area. Further, RVT received two voicemail messages (June 17, 2010 at 2:08 pm and June 18, 2010 at 3:55 pm) from the ABB executive in charge of North America Systems threatening "fast and furious legal action" against RVT if we did not succumb to its demands. The executive demanded a response in 24 hours or else he would "unleash the lawyers." During the time of this call, I was on vacation in the Midwest in an area of poor cell coverage. I received the voice messages two days later and responded with a voice message on Sunday, June 20, 2010. The next thing I knew, ABB filed this case against RVT and then unbelievably filed for a TRO with this court. Although I returned the voice messages while on vacation and explained the spotty cell coverage I was in, I never received a message back from this ABB executive after asking him in a return voice message to send me a text message with a call back time and number to insure I would receive his message in a timely fashion and insure I could reach him and discuss the matter.

19.     After business negotiations with ABB failed -- about one month after the auction, ABB notified us on June 24, 2010 that the loan equipment agreement was terminated. Thus, given the 30 days' prior notice that is required, the robots are less than 30 days overdue at ABB. We certainly know that we have an obligation to return the robots to ABB, and expect to complete that process in due course. It will take approximately two weeks to properly decommission, uninstall, safely pack and prepare the Robots for pick-up by ABB in an orderly fashion that is not unduly disruptive to other business. To the best of my knowledge, RVT's

safekeeping of these two ABB robots presents no material and urgent damage to this multi-billion dollar conglomerate. These are old and idle robots.

20.     ABB's extremely drastic, sudden and damaging demands smack of an anti-competitive tactic against fledging RVT. ABB is RVT's largest competitor. I was informed by an end-user of our software that ABB was discrediting the technology of Braintech. ABB told this particular end-user that they should not rely any further and should not purchase any of Braintech's new technology. In my opinion, Braintech may have lost a development project with this customer as a result of these anti-competitive and untrue comments by ABB.

21.     More than 100,000 man hours and $20 million have been invested in the development of the eVF source code. If ABB gets access to the source code ABB will have the potential to create new vision guidance products or spin-offs of the RVT product, and will be able to take advantage of years of development and testing to start completely new products. ABB could cripple our reputation by introducing bugs to modify the existing source code. In short, ABB will gain a market advantage by understanding every facet of RVT's technical know-how and proprietary algorithms. ABB could even change the existing product to run on other hardware or software platforms. Of course, ABB had an equal opportunity along with RVT to purchase these assets at the auction but it did not even attend the public auction it had prior knowledge of.

22.     If an injunction is granted, RVT would immediately lose the exclusivity of its main revenue product and RVT would lose control over upgrades available to its main line of products. The executables could be reverse engineered. RVT would have no way of monitoring whether and how ABB modified, copied or otherwise exploited the source code. It is RVT that

would sustain immediate and irreparable damages by having multiple products masquerading under the same eVF name.

23. Former Braintech customers are calling us to support and upgrade older systems – RVT is now interacting with these customers and feels an obligation to improve the eVF product. We do not have ABB's vast resources to scale products nor do we have ABB's contacts and network. The only competitive advantage we have over giants like ABB is the exclusive right to own the source code which RVT paid dearly for.

I solemnly affirm under the penalties of perjury that the contents of the foregoing paper are true to the best of my personal knowledge, information, and belief.

Dated: August 17, 2010

F.W.W.
_____
Frederick Weidinger